# WESTERN UNION TELEGRAPH COMPANY *v.* CALL PUBLISHING COMPANY.

ERROR TO THE SUPREME COURT OF THE STATE OF NEBRASKA.

No. 117. Argued and submitted December 4, 1900.—Decided April 15, 1901.

Where there is dissimilarity in the services rendered by a telegraph company to different persons, a difference in charges is proper, and no recovery can be had unless it is shown, not merely that there is a difference in the charges, but that the difference is so great as, under dissimilar conditions of service, to show an unjust discrimination; and the recovery must be limited to the amount of the unreasonable discrimination.

There is no body of Federal common law, separate and distinct from the common law existing in the several States, in the sense that there is a body of statute law enacted by Congress separate and distinct from the body of statutes enacted by the several States.

The principles of the common law are operative upon all interstate commercial transactions, except so far as they are modified by Congressional enactment.

Questions of fact, when once settled in the courts of a State, are not subject to review in this court.

THIS was an action commenced on April 29, 1891, in the district court of Lancaster County, Nebraska, by the Call Publishing Company to recover sums alleged to have been wrongfully charged and collected from it by the defendant, now plaintiff in error, for telegraphic services rendered. According to the petition the plaintiff had been engaged in publishing a daily newspaper in Lincoln, Nebraska, called The Lincoln Daily Call. The Nebraska State Journal was another newspaper published at the same time in the same city, by the State Journal Com-

pany. Each of these papers received Associated Press dispatches over the lines of defendant. The petition alleged:

"4th. That during all of said period the defendant wrongfully and unjustly discriminated in favor of the said State Journal Company and against this plaintiff, and gave to the State Journal Company an undue advantage, in this: that while the defendant demanded, charged and collected of and from the plaintiff for the services aforesaid seventy-five dollars per month for such dispatches, amounting to 1500 words or less daily, or at the rate of not less than five dollars per 100 words daily per month, it charged and collected from the said State Journal Company for the same, like and contemporaneous services only the sum of $1.50 per 100 words daily per month.

"Plaintiff alleges that the sum so demanded, charged, collected and received by the said defendant for the services so rendered the plaintiff, as aforesaid, was excessive and unjust to the extent of the amount of the excess over the rate charged the said State Journal Company for the same services, which excess was three dollars and fifty cents per one hundred words daily per month, and to that extent it was an unjust and wrongful discrimination against the plaintiff and in favor of the State Journal Company.

"That plaintiff was at all times and is now compelled to pay said excessive charges to the defendant for said services or to do without the same; that plaintiff could not dispense with such dispatches without very serious injury to its business."

The telegraph company's amended answer denied any unjust discrimination; denied that the sums charged to the plaintiff were unjust or excessive, and alleged that such sums were no more than a fair and reasonable charge and compensation therefor, and similar to charges made upon other persons and corporations at Lincoln and elsewhere for like services. The defendant further claimed that it was a corporation, engaged in interstate commerce; that it had accepted the provisions of the act of Congress entitled "An act to aid in the construction of telegraph lines and to secure to the government the use of the same for postal and other purposes," approved July 24, 1866; that it had constructed its lines under the au-

thority of its charter and that act, and denied the jurisdiction of the courts of Nebraska over this controversy. A trial was had, resulting in a verdict and judgment for the plaintiff, which judgment was reversed by the Supreme Court of the State. 44 Nebraska, 326. A second trial in the district court resulted in a verdict and judgment for the plaintiff, which was affirmed by the Supreme Court of the State, (58 Nebraska, 192,) and thereupon the telegraph company sued out this writ of error.

*Mr. Rush Taggart* for plaintiff in error. *Mr. John F. Dillon* was on his brief.

*Mr. Franklin W. Collins* and *Mr. John M. Stewart* for defendant in error submitted on their brief.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The contention of the telegraph company is substantially that the services which it rendered to the publishing company were a matter of interstate commerce; that Congress has sole jurisdiction over such matters, and can alone prescribe rules and regulations therefor; that it had not at the time these services were rendered prescribed any regulations concerning them; that there is no national common law, and that whatever may be the statute or common law of Nebraska is wholly immaterial; and that, therefore, there being no controlling statute or common law, the state court erred in holding the telegraph company liable for any discrimination in its charges between the plaintiff and the Journal company. In the brief of counsel it is said: "The contention was consistently and continuously made upon the trial by the telegraph company that, as to the state law, it could not apply for the reasons already given, and that, in the absence of a statute by Congress declaring a rule as to interstate traffic by the telegraph company, such as was appealed to by the publishing company, there was no law upon the subject." The logical result of this contention is that persons dealing with

common carriers engaged in interstate commerce and in respect to such commerce are absolutely at the mercy of the carriers. It is true counsel do not insist that the telegraph company or any other company engaged in interstate commerce may charge or contract for unreasonable rates, but they do not say that they may not, and if there be neither statute nor common law controlling the action of interstate carriers, there is nothing to limit their obligation in respect to the matter of reasonableness. We should be very loath to hold that in the absence of Congressional action there are no restrictions on the power of interstate carriers to charge for their services; and if there be no law to restrain, the necessary result is that there is no limit to the charges they may make and enforce.

It may be well at this time to notice what the exact rulings of the state court were: The charge to the plaintiff was $5 per 100 words, and to the State Journal Company $1.50 per 100 words. When the case came to the Supreme Court for examination of the proceedings in the first trial it appeared that no proper exceptions to the instructions had been preserved, and the only question, therefore, for consideration was the sufficiency of the evidence to sustain the verdict, and the court held that the mere fact of a difference in charge was not sufficient to invalidate the contract made with the plaintiff, and that there was no satisfactory evidence that the difference in the charge was unreasonable. In the course of its opinion the court said:

"There was no evidence tending to show that the charge to the Call Company was in itself unreasonably high, that the charge to the Journal Company was unreasonably low, or that the charge to either was greater or less than the ordinary or reasonable charge to others for similar services. It follows, therefore, that the verdict was sustained by the evidence if, as a matter of law, it was sufficient to show either that another person was obtaining dispatches for a less sum than the plaintiff, without regard to differences in conditions, or if it was sufficient to show a difference in rate accompanied by a difference in conditions, leaving to the jury, without other evidence, the duty of comparing the difference in rates with the difference

in conditions, and determining without other aid whether or not the difference in rates was disproportionate to the difference in conditions. But the verdict was not sustained by the evidence if a mere difference in rates without regard to conditions was insufficient to ground a right of action, or, a difference both in rates and conditions being shown, it was also necessary to establish by evidence that these differences were disproportionate. . . . As we have already stated, a considerable difference in the absolute rate charged the Call Company and the Journal Company was shown, but there was also shown a difference in conditions affecting the expense and difficulty of, rendering the services which at common law would justify some difference in rates, and this difference was one which the proviso quoted from the seventh section of our statute expressly recognizes as justifying a discrimination in this State.. There was no evidence to show that the rate charged the Call Company was unreasonably high. There was no evidence to show that the rate charged the Journal Company was unreasonably low. There was no evidence to show what difference in rates was demanded or justified by the exigencies of the differences in conditions of service. We do not think that the enforcement of contracts deliberately entered into should be put to the hazard of a mere conjecture by a jury without evidence upon which to base its verdict. How can it be said that a jury acts upon the evidence and reaches a verdict solely upon consideration thereof when, having established a difference in rates and a difference in conditions, without anything to show how one difference affects the other, or to what extent it is permitted to measure one against the other, and to say that to the extent of one dollar or to the extent of one thousand dollars the difference in rates was disproportionate to the difference in conditions? It may be said that it would be difficult to produce evidence to show to what extent such differences in conditions reasonably affect rates. This may be true, but the answer is that whatever may be the difficulties of the proof, a verdict must be based upon the proof and a verdict must be founded upon evidence and not upon the conjecture of the jury, or its

general judgment as to what is fair, without evidence whereon to found such judgment."

Under this construction of the law the first judgment was reversed and the second trial proceeded upon the lines thus laid down by the Supreme Court. On that trial the court charged:

"You are instructed that not every discrimination in rates charged by a telegraph company is unjust. In order to constitute an unjust discrimination there must be a difference in rates under substantially similar conditions as to service; the rate charged must be a reasonable rate; under like conditions it must render its services to all patrons on equal terms; it must not so discriminate in its rates to different patrons as to give one an undue preference over another.

"It is not an undue preference to make one patron a less rate than another where exist differences in conditions affecting the expense or difficulty in performing the services which fairly justify the difference in rates, and where it is shown that a difference in rate exists, but there is also a substantial difference in conditions affecting the difficulty or expense of performing the service, no cause of action arises without evidence to show that the difference in rates is disproportionate to the difference in conditions.

"In this action there is shown to exist, not only, on the one hand, a difference in the rates charged to the patrons of the telegraph company, the Call Publishing Company and the State Journal Company, but, on the other hand, also a difference in the conditions under which the telegraph services were rendered to the two companies, and the question that you have particularly to direct your attention to is how far this difference in condition justified the difference in rates charged; to what extent, if any, the difference in rates charged the rival companies was disproportioned to the difference in conditions under which the services were rendered. If you find such disproportions to have existed, and that by reason thereof the amount charged the plaintiff was in excess of what a reasonable rate would be under the circumstances, then you are to find, if facts have been presented to you by which you can find,

the amount of such excess as the amount which the plaintiff would be entitled to recover.

" The burden of proof is upon the plaintiff to show by a preponderance of the evidence the existence of the discrimination claimed by it; also that the differences in conditions shown are disproportionate to the difference in charges made, as well as all the other material allegations of its petition.

" You should approach this case, not in an attitude as if you were charged with the duty of determining rates for the telegraph company. Its stock is the property of private individuals, who have elected officials for that purpose. They are there to manage the affairs of their corporation in their own way, so long as what they do is within reason. Courts of law are maintained to correct abuses, and it is only after the plaintiff has convinced you that the telegraph company has abused its privileges that the court will interfere. The telegraph company is a common carrier, and is said to exercise *quasi*-public functions. On the other hand, the Call Publishing Company has certain legal rights. It embarks in an enterprise in the city of Lincoln. It has for a competitor the State Journal Company, and perhaps others. In its race for success it ought not to be unfairly handicapped. For the purpose of getting the news both it and The Journal use the Associated Press dispatches. In fixing its charges to these two competing companies for these dispatches it is the duty of the telegraph company not to unjustly discriminate in favor of either, as explained to you in these instructions; and, as before stated to you, if the plaintiff has been able to convince you that the defendant has so discriminated, then the telegraph company would be required to answer to the plaintiff in whatever damages the plaintiff has satisfied you he has suffered.

" In arriving at your verdict you should consider whatever evidence there is going to show charges made by the telegraph company to other persons or in other places for like services under like conditions; the increased cost of operating plant occasioned by increased work, if any; the difference of volume of business between the telegraph company's day and night work, as it would be a reasonable discrimination for the com-

pany to make this difference the basis for a difference in charges; the difference in charges between day and night services generally, as shown by the evidence; also the difference in the character of the night and day work; the time required to perform it, as shown by the evidence; the charges made by the company for other services unless made under circumstances and conditions different from those under consideration, so as not to furnish a fair criterion as to charges; the general operating expenses of the company as affected by rates charged, as well as all other facts before you which may aid you in arriving at a conclusion. However, this is to be understood: that for the plaintiff to recover it must show the discrimination; that the discrimination was unjust, as explained in these instructions; and, further, you must be able from the evidence furnished you to measure the damages, if any, sustained by the plaintiff. You are not to fix the damages in any haphazard manner, nor by mere speculation, but by reasons sustained by the evidence and showing in a reasonable way the amount thereof.

" The jury are instructed that the defendant telegraph company is not presumed to have unjustly discriminated against any of its patrons and in favor of certain other of its patrons, but, on the contrary, it is presumed to have properly and justly established its rates according to the various kinds of service it may be called upon to render, considering its duty to the public and to its stockholders."

And it was under these instructions that the jury returned a verdict for the plaintiff. The case, therefore, was not submitted to the jury upon the alleged efficacy of the Nebraska statute in respect to discriminations, but upon the propositions distinctly stated, that where there is dissimilarity in the services rendered a difference in charges is proper, and that no recovery can be had unless it is shown, not merely that there is a difference in the charges, but that that difference is so great as, under dissimilar conditions of service, to show an unjust discrimination, and that the recovery must be limited to the amount of the unreasonable discrimination.

No one can doubt the inherent justice of the rules thus laid down. Common carriers, whether engaged in interstate com-

merce or in that wholly within the State, are performing a public service. They are endowed by the State with some of its sovereign powers, such as the right of eminent domain, and so endowed by reason of the public service they render. As a consequence of this, all individuals have equal rights both in respect to service and charges. Of course, such equality of right does not prevent differences in the modes and kinds of service and different charges based thereon. There is no cast iron line of uniformity which prevents a charge from being above or below a particular sum, or requires that the service shall be exactly along the same lines. But that principle of equality does forbid any difference in charge which is not based upon difference in service, and even when based upon difference of service, must have some reasonable relation to the amount of difference, and cannot be so great as to produce an unjust discrimination. To affirm that a condition of things exists under which common carriers anywhere in the country, engaged in any form of transportation, are relieved from the burdens of these obligations, is a proposition which, to say the least, is startling. And yet, as we have seen, that is precisely the contention of the telegraph company. It contends that there is no Federal common law, and that such has been the ruling of this court; there was no Federal statute law at the time applicable to this case, and as the matter is interstate commerce, wholly removed from state jurisdiction, the conclusion is reached that there is no controlling law, and the question of rates is left entirely to the judgment or whim of the telegraph company.

This court has often held that the full control over interstate commerce is vested in Congress, and that it cannot be regulated by the States. It has also held that the inaction of Congress is indicative of its intention that such interstate commerce shall be free, and many cases are cited by counsel for the telegraph company in which these propositions have been announced. Reference is also made to opinions in which it has been stated that there is no Federal common law different and distinct from the common law existing in the several States. Thus, in *Smith* v. *Alabama*, 124 U. S. 465, 478, it was said by Mr. Justice Matthews, speaking for the court:

"There is no common law of the United States in the sense of a national customary law distinct from the common law of England as adopted by the several States, each for itself, applied as its local law, and subject to such alteration as may be provided by its own statutes.   *Wheaton* v. *Peters,* 8 Pet. 591. A determination in a given case of what that law is may be different in a court of the United States from that which prevails in the judicial tribunals of a particular State.   This arises from the circumstance that courts of the United States, in cases within their jurisdiction where they are called upon to administer the law of the State in which they sit, or by which the transaction is governed, exercise an independent, though concurrent, jurisdiction, and are required to ascertain and declare the law according to their own judgment.   This is illustrated by the case of *Railroad Co.* v. *Lockwood,* 17 Wall. 357, where the common law prevailing in the State of New York in reference to the liability of common carriers for negligence received a different interpretation from that placed upon it by the judicial tribunals of the State; but the law as applied is none the less the law of that State."   p. 478.

Properly understood, no exceptions can be taken to declarations of this kind.   There is no body of Federal common law separate and distinct from the common law existing in the several States in the sense that there is a body of statute law enacted by Congress separate and distinct from the body of statute law enacted by the several States.   But it is an entirely different thing to hold that there is no common law in force generally throughout the United States, and that the countless multitude of interstate commercial transactions are subject to no rules and burdened by no restrictions other than those expressed in the statutes of Congress.

What is the common law?   According to Kent: "The common law includes those principles, usages and rules of action applicable to the government and security of person and property, which do not rest for their authority upon any express and positive declaration of the will of the legislature."   1 Kent, 471.   As Blackstone says: "Whence it is that in our law the goodness of a custom depends upon its having been used time

out of mind; or, in the solemnity of our legal phrase, time whereof the memory of man runneth not to the contrary. This it is that gives it its weight and authority; and of this nature are the maxims and customs which compose the common law, or *lex non scripta*, of this kingdom. This unwritten, or common, law, is properly distinguishable into three kinds: 1. General customs; which are the universal rule of the whole kingdom, and form the common law, in its stricter and more usual signification." 1 Blackstone, 67. In Black's Law Dictionary, page 232, it is thus defined: "As distinguished from law created by the enactment of legislatures, the common law comprises the body of those principles and rules of action relating to the government and security of persons and property, which derive their authority solely from usages and customs of immemorial antiquity, or from the judgments and decrees of the courts recognizing, affirming and enforcing such usages and customs; and, in this sense, particularly the ancient unwritten law of England."

Can it be that the great multitude of interstate commercial transactions are freed from the burdens created by the common law, as so defined, and are subject to no rule except that to be found in the statutes of Congress? We are clearly of opinion that this cannot be so, and that the principles of the common law are operative upon all interstate commercial transactions except so far as they are modified by Congressional enactment.

But this question is not a new one in this court. In *Interstate Commerce Commission* v. *Baltimore & Ohio Railroad*, 145 U. S. 263, 275, a case which involved interstate commerce, it was said by Mr. Justice Brown, speaking for the court:

"Prior to the enactment of the act of February 4, 1887, to regulate commerce, commonly known as the interstate commerce act, 24 Stat. 379, c. 104, railway traffic in this country was regulated by the principles of common law applicable to common carriers."

In *Bank of Kentucky* v. *Adams Express Co.*, and *Planters' Bank* v. *Express Co.*, 93 U. S. 174, 177, the express companies received at New Orleans certain packages for delivery at Louisville. These were interstate shipments. In the course of tran-

sit the packages were destroyed by fire, and actions were brought to recover the value thereof. The companies defended on the ground of an exemption from liability created by the contracts under which they transported the packages. Mr. Justice Strong, delivering the opinion of the court, after describing the business in which the companies were engaged, said:

"Such being the business and occupation of the defendants, they are to be regarded as common carriers, and, in the absence of stipulations to the contrary, subject to all the legal responsibilities of such carriers."

And then proceeded to show that they could not avail themselves of the exemption claimed by virtue of the clauses in the contract. The whole argument of the opinion proceeds upon the assumption that the common-law rule in respect to common carriers controlled.

Reference may also be made to the elaborate opinion of District Judge Shiras, holding the Circuit Court in the Northern District of Iowa, in *Murray* v. *Chicago & Northwestern Railway*, 62 Fed. Rep. 24, in which is collated a number of extracts from opinions of this court, all tending to show the recognition of a general common law existing throughout the United States, not, it is true, as a body of law distinct from the common law enforced in the States, but as containing the general rules and principles by which all transactions are controlled, except so far as those rules and principles are set aside by express statute. It would serve no good purpose to here repeat those quotations; it is enough to refer to the opinion in which they are collated.

It is further insisted that even if there be a law which controls there is no evidence of discrimination such as would entitle the plaintiff to the verdict which it obtained. But there was testimony tending to show the conditions under which the services were rendered to the two publishing companies, and it was a question of fact whether, upon the differences thus shown, there was an unjust discrimination. And questions of fact, as has been repeatedly held, when once settled in the courts of a State, are not subject to review in this court. *Dower* v. *Richards*, 151 U. S. 658; *Egan* v. *Hart*, 165 U. S. 188; *Chicago, Burlington &c. Railroad* v. *Chicago*, 166 U. S. 226–242; *Hed-*

*rick* v. *Atchison, Topeka & Sante Fé Railroad,* 167 U. S. 673, 677; *Gardner* v. *Bonestell,* 180 U. S. 362.

These are the only questions of a Federal nature which are presented by the record, and finding no error in them the judgment of the Supreme Court of Nebraska is

*Affirmed.*