## RAYNOLDS HOLDING CO. et al. v. EL PASO ELECTRIC CO.
### No. 2966.

Court of Civil Appeals of Texas. El Paso.
March 29, 1934.

Rehearing Denied May 3, 1934.

Wilchar & Wilchar, of El Paso, for appellants.

Brown & Brooke, of El Paso, for appellee.

PELPHREY, Chief Justice.

Prior to August 1, 1921, the First National Bank of El Paso owned a seven-story building in El Paso, Tex. On that date the First Mortgage Company completed a fifteen-story structure adjoining it. The same elevators, pursuant to an agreement between the owners, were used to carry the passengers to both buildings. The First Mortgage Company conveyed its building to Joshua S. Raynolds, now deceased, on September 24, 1929. Raynolds owned the property until December 23, 1929, when he conveyed it to the Raynolds Holding Company, who continued to own it until February 1, 1933. Appellee furnished direct electric current to the owners of the two buildings to operate these elevators. The two buildings were, for convenience, known as the First National Bank building, and the bills for the electric current used in the buildings were directed to the First National Bank building. There was an agreement between the owners of the buildings to share the expenses of operating them including payments for electricity, the First Mortgage Company and its successors in title paying 54 per cent. and the First National Bank paying 46 per cent.

On February 18, 1933, the Raynolds Holding Company, a corporation, S. O. Pottorff, receiver of the First National Bank, and M. H. Barrough, administrator of the estate of Joshua S. Raynolds, deceased, filed suit against appellee alleging that it had overcharged them for the direct current used in said buildings between August 1, 1921, and August 1, 1932, in the total sum of $15,215.-20. The First Mortgage Company had theretofore assigned its cause of action to Raynolds Holding Company.

Appellants pleaded that appellee had agreed to charge them the published rates for the current used by them, which was: "10¢ per K. W. H. for the first 40 hours of use per month of the demand. 5¢ per K. W. H. for next 500 K. W. H, 2¢ per K. W. H. for next 2,000 K. W. H.; 1¢ per K. W. H. for all excess."

Along with the published rate was the following explanation:

"Demand is defined as follows: Entire connected load up to 5 K. W.; 80% of the next 10 K. W. of connected load; 60% of the next 10 K. W. of connected load; but not less than actual measured demand which will be used for installations of more than 25 K. W. Measured demand will be the greatest average load for any thirty minute interval during the twelve months' period ending with the current month."

Appellants further alleged that during the whole period appellee sent its bill for direct current on the first of each month; that on each of them there was charged 2,266 kilowatt hours at the 10-cent rate, 500 kilowatt hours at the 5-cent rate, and 2,000 kilowatt hours at the 2-cent rate; that in each bill appellee falsely and fraudulently represented that the measured demand was 56.65 kilowatts; that in truth and in fact appellee had never measured the demand upon which said bills were based; that the installation in said buildings was greater than 25 kilowatts; and that, if appellee had measured the demand as it represented it had done in its monthly bills, the kilowatt hours for which the 10-cent rate should have been charged would not have exceeded 1,000, making the measured demand rate 25 K. W. instead of 56.65 K. W.

Appellants also alleged that they discovered the overcharge in August, 1932, and could not have discovered it sooner by the use of reasonable diligence; that the electric current in which appellee dealt, its rates, and the bills in connection therewith were highly technical; that appellee was possessed of a superior knowledge thereof; that "a demand" as defined in the published rate re-

quired expert knowledge to be understood; that appellee had knowledge of the falsity of the representations made by it; that appellants were at all times in ignorance of their falsity; that appellee intended to mislead appellants and that it concealed and continued to conceal its fraud by renewing each month its fraudulent representations; that appellee, by reason of the continued concealment was estopped to plead the statute of limitations; and that Raynolds Holding Company had received a refund of $2,279.52, which covered only a period of 24 months.

Appellee answered by general demurrer and special exceptions, as follows: (1) That the claim appeared on the face of the petition to be barred by the two-year statute of limitations; (2) that the allegations of fraud were too general, mere conclusions of the pleader, and, therefore, insufficient; and that the allegations of estoppel were also too general and only conclusions. It further generally denied the allegations of the petition and specially pleaded the two-year statute of limitation and accord and satisfaction by reason of the acceptance of the $2,279.52 as shown in appellant's petition.

Appellee further alleged that the direct current meter to the buildings was open to being read and checked by appellants and their predecessor in title; denied that there was any concealment of any facts relative thereto; and alleged that the First Mortgage Company had an agent in charge of the matter and who approved the bills for it who was an expert in handling and dealing with electrical matters and who had by years of experience become familiar with the manner in which power was furnished and bills therefor made out.

By supplemental petition, appellants excepted to certain allegations in appellee's answer and pleaded that the instruments pleaded by appellee (two letters, one from McNary to appellee and one from appellee to McNary) were not intended to and did not constitute any release or accord and satisfaction of any claim except the claim of the Raynolds Holding Company for the 24-month period just prior thereto; that the overcharge was discovered in August, 1932, through engineers who had been employed to discover wherein a saving might be made in electric bills; that McNary was in charge of the buildings only a few months more than the 24 months mentioned in his letter to appellee and at no time made any claim for any refund further back than the 24 months; that he was unaware of any liability on claims arising before the Raynolds Holding Company became the owner of the building and had no authority to make any claim for any one, save and except the Raynolds Holding Company.

Appellee in reply alleged that McNary was the general agent of the owners of the building; had been held out to them as such; that his acts were, therefore, binding upon appellants; and that appellants having cashed the check given in settlement by appellee and having used the proceeds thereof were estopped to deny McNary's authority.

At the conclusion of the testimony appellee requested an instructed verdict in its favor on the ground that the action was barred by limitation. This request was denied and the case submitted to the jury on five special issues. The jury found: (1) That during the period beginning August 1, 1921, and ending October 7, 1930, appellee collected a charge in excess of the demand rate applicable to the years embraced in said period; (2) that such excess collected amounted to $94.98 per month; (3) that appellants did not actually discover and could not by the use of ordinary diligence have discovered the excessive charges prior to the 18th day of February, 1931; (4) that the refund of $2,279.52 made by appellee to Raynolds Holding Company was not intended or understood by appellee or Raynolds Holding Company as a settlement of the entire claim and beyond the 24-month period; and (5) that G. R. McNary in effecting the settlement was not acting with authority or in the apparent scope of the authority conferred upon him by S. O. Pottorff, receiver.

The trial court, upon the motion of appellee, rendered judgment in its favor non obstante veredicto and this appeal resulted.

## Opinion.

Appellants assail the action of the trial court in rendering judgment in favor of appellee notwithstanding the verdict because of the jury's finding that appellants did not actually discover the overcharge and could not have done so by the use of reasonable diligence and because the conduct of appellee, it being a public utility company, enjoining a monopoly and extraordinary powers, should be held strictly accountable for any false or fraudulent representations, and, where it has repeated such false and fraudulent representations over a term of years, it should be estopped to plead the statute of limitation against its customer who depended upon its fidelity.

Under these contentions they argue that the

issue of limitation is a question of fact; that where reasonable minds might differ as to the conclusions to be drawn from evidence, a jury finding is conclusive on the court; and that there being ample evidence to support the jury's finding that appellants did not actually discover the fraud and could not have done so by the use of reasonable diligence, the court should have rendered judgment in their favor.

■ The trial court based its actions in rendering judgment non obstante veredicto upon the ground that the amount of current to be charged for a maximum rate under the schedule, being a measured rate, and the bills at all times showing the same to be constant during the ten years or more was sufficient in and of itself to put the plaintiffs, their servants, agents, and employees upon inquiry and gave notice that the same had not been measured, and that as to any payments made more than two years prior to the filing of appellant's suit, they were barred by the statute of limitations (Rev. St. 1925, art. 5526). With such conclusion we find ourselves unable to agree. Public service corporations, such as appellee, are in a slightly different position from ordinary corporations. They have the right of eminent domain, are to a degree, at least, monopolies, are permitted to place their poles upon public streets and highways, and are allowed to earn a fair return upon the amount they have invested.

■ Occupying such a position, they are not permitted to discriminate between their customers. Armour Packing Co. v. Edison Electric Illuminating Co., 115 App. Div. 51, 100 N. Y. S. 605; Gibbs v. Consolidated Gas Co. of Baltimore, 130 U. S. 396, 400, 408, 9 S. Ct. 553, 32 L. Ed. 979; Western Union Telegraph Company v. Call Publishing Co., 181 U. S. 92, 21 S. Ct. 561, 45 L. Ed. 765; 10 American & English Encyclopedia of Law (2d Ed.) 869. It has also been held that they are obligated to advise their customers of facts relative to the business in which they are engaged a knowledge of which would be advantageous to the customer. Bilton Machine Tool Co. v. United Illuminating Co., 110 Conn. 417, 148 A. 337, 67 A. L. R. 814.

From these and other authorities it clearly appears, we think, that public service corporations owe absolute fidelity to their customers, and, this being true, the customers have a right to rely upon representations made by them.

In the present case, appellants and their predecessors in title were well within their rights in accepting the statements appearing in the bills as true and correct unless there was something about them which would indicate to the ordinary person that the statements were untrue.

There is no dispute here that the business of manufacturing and dispensing electricity is a technical one and that the measuring of electric current is very technical indeed, and it must be conceded that the ordinary person knows little of the meaning of the terms used in the bills introduced here in evidence.

■■ The fact that the first three amounts shown on such bills remained constant would, of course, be a circumstance tending to show that the demand had not been measured each month and would have been sufficient to support a finding of the jury that appellants had notice of facts sufficient to put them on inquiry, but it was not, in our opinion, under the peculiar facts and circumstances, sufficient to establish that fact as a matter of law. The fact that the jury here found that appellants could not have discovered, by the exercise of reasonable diligence, that there had been excessive charges is evidence of the fact that reasonable minds might differ as to the conclusion to be drawn from such fact. Appellee, however, contends that Mr. Judd, who was auditor for the First Mortgage Company and who audited and checked the electric bills for the two buildings, had been employed by appellee for many years prior to his being employed by the First Mortgage Company; that he knew as much about electric rates as some of its expert employees and the bills having been approved by him, there was notice to appellants through him.

On the question of Judd's knowledge of matters electrical we find the following in the record: R. R. Bowie testified that Jay Turner, engineer of the building, read the meters and reported to Mr. Judd; that Mr. Judd had charge of the electric department; that he checked the electric bills; that he and the engineer checked the meters together; that he acted for both the First National Bank and the First Mortgage Company in checking the bills; and that he (Bowie) did not pay the electric bills until they had been O. K.'d by him.

Tom Newman testified that the electric bills were O. K.'d by Judd; that Judd and Bowie handled all the expenses of the buildings; that the electric bills were not passed to Judd because of his experience in electrical business but because he and Bowie attended to all the bills incident to the operation of the buildings, and that he thought Judd had

been connected with the electrical business all his life.

Jay Turner testified that Judd had charge of checking electric bills.

J. H. Warden, sales manager for appellee, in his deposition, testified that Judd handled and checked the electric bills; that he had had occasion to discuss some of the electric bills with Judd; that Judd was well informed about electric rates; and that he had been told that Judd had formerly been connected with appellee.

On examination in the trial he further testified that on the occasion in question Judd had questioned some of the bills and the application of the rates in connection with the First National Bank building; that Judd knew more about rates than he did, but that he (Warden) was not an expert on rates; that Judd knew what each rate was and what it meant; that he learned later that Judd had been assistant treasurer for appellee; that the handling of bills and rate matters is directly under the supervision of the assistant treasurer; that Judd took him down in the basement and showed him what the different meters were for; that the discussion he had with Judd was not relative to demand meters on direct current; that his records did not show that there had even been a measured demand taken for the current used in running the elevators; that the meter department reads the meters, sends the reading to the billing department, and the billing department sends out the bills; and that the bills are based upon the information given the billing department by the meter department. This testimony, we think, fails to show such expertness on the part of Judd in measuring electric current as that a checking and approval of the bills by him would constitute notice to appellants through him of the overcharges.

The presumption is that employees are loyal to their employers and it is hardly credible that Judd would have continued to approve appellee's bills containing the overcharges had he been aware of their existence. Among others the trial court submitted the following issues:

"Question No. Three.

"Do you find from a preponderance of the evidence that at all times anterior to the 18th day of February, 1931, plaintiffs failed to actually discover, and could not by the exercise of reasonable diligence discover, that there had been, in respect to the demand rate collected, excessive charges, if excessive charges were collected on said demand rate?"

"Supplemental Issue No. A.

"Do you find that G. R. McNary, in effecting the settlement evidenced by the letters introduced in evidence, was acting with authority, or in the apparent scope of the authority conferred upon him by S. O. Pottorff, Receiver?"

Appellee now cross-assigns error to the submission of these issues on the ground that there was no evidence justifying their submission. It also attacks by cross-assignment the judgment in favor of S. O. Pottorff, receiver, for $1,048.52.

This latter cross-assignment, as well as the one attacking the submission of supplemental issue No. A, have no bearing upon the matters presented on this appeal, and, appellee not having appealed from the judgment in favor of the receiver, cannot be considered. Ward v. Marion County, 26 Tex. Civ. App. 361, 62 S. W. 557, 63 S. W. 155; Texas & N. O. Railway v. Skinner, 4 Tex. Civ. App. 661, 23 S. W. 1001; Veatch v. Gilmer (Tex. Civ. App.) 111 S. W. 746; Davis v. Bowie (Tex. Civ. App.) 247 S. W. 308; Hunt v. Garrett (Tex. Civ. App.) 275 S. W. 96; Fife v. Indemnity Ins. Co. (Tex. Civ. App.) 283 S. W. 645; Booth v. Uvalde Rock Asphalt Co. (Tex. Civ. App.) 296 S. W. 345.

The question presented in the cross-assignment attacking the submission of issue No. 3 has been dealt with in our discussion of the correctness of the judgment non obstante veredicto, and, in accordance with our views there expressed, will be overruled.

The case appearing to have been fully developed, the judgment of the trial court will be reversed and judgment here rendered that appellants, in addition to the $1,048.32, recovered by the receiver, recover the sum of $15,174.79, to be apportioned 46 per cent. to the receiver and 54 per cent. to the Raynolds Holding Company and M. H. Barrough, administrator of the estate of Joshua S. Raynolds, deceased.

Justice Higgins is disqualified by reason of interest in the estate represented by the receiver and because of such disqualification did not participate in this decision.

HIGGINS, J., disqualified and not sitting.

On Motion for Rehearing.

In the reply of appellants to appellee's motion for rehearing it has been called to our

attention that the total amount sued for was $17,894.84, instead of $15,215.20, as stated in our opinion. The opinion is accordingly corrected to state the amount first mentioned.

Appellants further admit an error in their calculations as to the amount due in the sum of $180.50.

Our previous judgment will be corrected to allow appellants to recover $14,994.29, instead of $15,174.79. This amount to be in addition to the $1,048.32 recovered by the receiver, and to be apportioned 46 per cent. to the receiver and 54 per cent. to the Raynolds Holding Company, and M. H. Barrough, administrator of the estate of Joshua S. Raynolds, deceased, and to bear interest at the rate of 6 per cent. per annum from June 29, 1933, the date of judgment.

With the above corrections, the motion for rehearing is overruled.