CITY OF FRANKFORT, INDIANA,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Public Service Company of Indiana, Inc.,
Party Respondent.

No. 81–1777.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 12, 1982.

Decided May 17, 1982.

James D. Pembroke, Duncan, Weinbreg & Miller, P. C., Washington, D. C., for petitioner.

Joanne Leveque, Fed. Energy Reg. Comm., George F. Bruder, Bruder & Gentile, Washington, D. C., for respondent.

Before WOOD and POSNER, Circuit Judges, and WILL,* Senior District Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

The city of Frankfort, Indiana ("Frankfort") appeals from an order of the Federal Energy Regulatory Commission (the "Commission"). The Commission, in response to a remand order from this court, affirmed the Administrative Law Judge's findings of factual differences which justify a rate disparity between Frankfort and members of the same class of municipal purchasers of electrical power. We affirm.

I.

Frankfort purchased part of its electric power and energy at wholesale from the Public Service Company of Indiana, Inc.

---

* The Honorable Hubert L. Will, Senior District Judge of the Northern District of Illinois, is sitting by designation.

("PSCI"). Four other municipalities in Indiana—Crawfordsville, Logansport, Peru, and Washington (the "Interconnected Cities")—were also partial requirements customers of PSCI. The Interconnected Cities constitute the partial requirements class of PSCI customers.

In 1968, PSCI offered substantially identical agreements to the Interconnected Cities. These agreements contained fixed-rate or *Mobile-Sierra*[1] clauses which prevented PSCI from effectuating a unilateral rate increase by filing an increase with the Commission. *United Gas Pipe Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956); *Boroughs of Chambersburg v. FERC*, 580 F.2d 573, 574 n.2 (D.C.Cir.1978) (per curiam). In 1968, Crawfordsville and Peru executed 10-year agreements; Washington accepted a similar agreement in 1969; Logansport and Frankfort did not execute agreements in 1968. Although there is no conclusive reason why Frankfort did not execute an agreement in 1968,[2] the record suggests that the city was considering improving its own generating capacity and presumably its needs would be changing in the future.

In March, 1971, Logansport entered into an agreement which was similar to the other three existing contracts. In July, 1971, PSCI filed an application with the Commission for a wholesale rate increase for non-generating utilities. In August, 1971, Frankfort indicated its interest in executing an interconnection agreement with PSCI. Later in August, 1971, a number of municipal customers, including Frankfort, resisted PSCI's filing, alleging that PSCI lacked the contractual capacity to unilaterally increase the rates. Frankfort withdrew from the proceeding when it became clear that, as a generating utility, it would not be affected by PSCI's filing.

These protests focused PSCI's attention on the risks of entering into agreements with *Mobile-Sierra* clauses since such clauses limited PSCI's ability to freely increase rates. The testimony indicates that prior to the protests, PSCI believed that, in the event of rising costs, the Interconnected Cities would be willing to renegotiate their contracts despite the fact that they held fixed-rate contracts. The cities' objections to PSCI's 1971 rate filing, however, indicated that cities were likely to enforce their rights under provisions of fixed-rate contracts.

PSCI therefore decided to implement a new policy that the utility company would no longer offer contracts with *Mobile-Sierra* clauses. That policy remains unchanged to the present time and today, PSCI has no remaining fixed-rate contracts. Thus, the contract that PSCI tendered and Frankfort accepted contained a going-rate or *Memphis* clause which allowed PSCI to file for rate increases with the Commission.[3] *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division*, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958). The record indicates that there were no objections at the time that the contract was executed.

In 1974, PSCI filed proposed rate increases for services to its wholesale customers with the Commission. It is unnecessary to review the lengthy administrative proceedings conducted in response to PSCI's proposed rate increases. In short, the Commission allowed PSCI to unilaterally change the rates charged to Frankfort, but not the rates charged to the other Interconnected

---

1. Although some courts have referred to this doctrine or line of cases as "Sierra-Mobile," we adopt the Commission's terminology.

2. In July, 1968, Frankfort instead entered into a five-year bulk power supply contract. The rates charged to Frankfort were higher under this contract than the rates would have been if Frankfort had entered into the type of fixed-rate contract offered to each Interconnected City.

3. Frankfort's agreement with PSCI stated that the rates "may be changed by the Company from time to time by filing such change(s) with the Federal Power Commission and upon the receipt of such Commission's acceptance for filing will supersede and cancel the present . . . rate provisions."

Cities. The Commission found that, although the rates charged to the four cities having *Mobile-Sierra* contracts would be lower than the rates charged to Frankfort, the disparity was due to the difference between the contracts. The Commission observed that the lower rates charged the other four Interconnected Cities did not violate the anti-discrimination standard of section 206 of the Federal Power Act, 16 U.S.C. § 824e (1974). Moreover, it found that the rates charged Frankfort were "just and reasonable" within the meaning of section 205(a) of the Act, 16 U.S.C. § 824d(a) (1976).

On appeal, this court affirmed the findings that the Interconnected Cities, which purchase only a portion of their electricity requirements from PSCI, constituted a discrete class of customers, that all the Interconnected Cities except Frankfort had contracts which contained *Mobile-Sierra* clauses, and that section 206(a), 16 U.S.C. § 824e(a), did not require reformation of the fixed-rate contracts. *Public Service Co. of Indiana v. Federal Energy Regulatory Commission*, 575 F.2d 1204 (7th Cir. 1978). Moreover, the court found that PSCI had the right under its going-rate contract with Frankfort to unilaterally increase Frankfort's rates. *Id.* at 1210. We noted, however, that while the increased rates chargeable to Frankfort were "just and reasonable" within the meaning of section 205(a), the difference in contracts and the resulting higher rates charged only to Frankfort might constitute discrimination in violation of section 205(b) of the Federal Power Act, 16 U.S.C. § 824d(b), *unless* there were some factual differences which justified the disparity in treatment. The execution of different contracts was not, in itself, sufficient to justify rate disparities in light of the proscription against discrimination in section 205(b). We, therefore, remanded the proceedings to the Commission to determine whether factual differences existed which justified the specific rate differences resulting from Frankfort's *Memphis*-type contract. We required the Commission to

"show not only that factual differences justify some rate differences, but also that the factual differences justify the specific rate differences permitted." *Id.* at 1212.

The Commission, in turn, remanded the case for further fact finding before the Administrative Law Judge. The ALJ concluded that the disparity was "justified by significant factual differences at the times the contracts were negotiated." The significant differences were:

1. Frankfort had an opportunity to enter into a fixed-rate contract and did not do so.
2. PSCI's policy of no longer offering fixed-rate contracts was done in the interest of the company's financial stability.
3. The change in PSCI's policy was not aimed specifically at Frankfort. PSCI has not offered any fixed-rate contracts to any customer since July, 1971.

Moreover, the ALJ found that the Frankfort-PSCI contract was negotiated in good faith and that there was neither "evidence of undue discrimination or preference," nor "favoritism or animosity in the negotiation of the contracts." The ALJ concluded that "Frankfort here is seeking to be relieved, retroactively, from the adverse consequences of its own decisions which, in hindsight, appear to have been ill-advised. This simply is not a ground for relief."

█ Frankfort took exception to the ALJ's findings. The Commission affirmed the ALJ's decision and Frankfort's Application for Rehearing was denied by operation of law. Frankfort petitioned this court to review whether the Commission sufficiently complied with our earlier remand order.[4] Under the Federal Power Act, the findings of the Commission as to the facts, if supported by substantial evidence on the record as a whole, are conclusive. Federal Power Act § 313(b), 16 U.S.C. § 825*l*(b) (1976); *FPC v. Southern California Edison Co.*, 376 U.S. 205, 209 n.5, 84 S.Ct. 644, 647 n.5, 11 L.Ed.2d 638 (1964); *Public Service Co. v.*

---

4. PSCI filed a brief as intervenor responding to Frankfort's appeal.

*FPC,* 375 F.2d 100, 103 (7th Cir.), *cert. denied,* 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 992 (1967); *St. Michaels Utility Commission v. FPC,* 377 F.2d 912, 917 (4th Cir. 1967).

## II.

Frankfort's claim of undue discrimination must be viewed in light of three Supreme Court decisions, section 205(b) of the Federal Power Act, and recent District of Columbia Circuit cases. Two of the Supreme Court decisions—*United Gas Pipe Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956), and *FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956)—hold that under parallel provisions of the Natural Gas and Federal Power Acts, regulated suppliers cannot unilaterally increase rates charged to customers whose contracts specify fixed rates. In *Mobile,* the Court noted that such a conclusion fully promotes the purposes of the Natural Gas Act.

> By preserving the integrity of contracts, it permits the stability of supply arrangements which all agree is essential to the health of the natural gas industry. Conversion by consumers, particularly industrial users, to the use of natural gas may frequently require substantial investments which the consumer would be unwilling to make without long-term commitments from the distributor, and the distributor can hardly make such commitments if its supply contracts are subject to unilateral change by the natural gas company whenever its interests so dictate.... On the other hand, denying to natural gas companies the power unilaterally to change their contracts in no way impairs the regulatory powers of the Commission, for the contracts remain fully subject to the paramount power of the Commission to modify them when necessary in the public interest. The Act thus affords a reasonable accommodation between the conflicting interest of contract

stability on the one hand and public regulation on the other.

350 U.S. at 344, 76 S.Ct. at 380.

In the companion case of *Sierra,* the court indicated that the Commission, under section 206 of the Federal Power Act, might revise a rate set by contract if it was contrary to the public interest. The mere fact that the rate produced less than a fair return, however, was insufficient. Rather, "the rate [must be] so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." 350 U.S. at 355, 76 S.Ct. at 372.

Finally, in *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division,* 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958), the Court held that where a public utility's contract with a customer permitted the utility "to change its rates from time to time," such changes could become effective upon unilateral filing with the Commission. The Court noted that while the

> public interest requires the protection of consumers from excessive prices for natural gas ... [b]usiness reality demands that natural gas companies should not be precluded by law from increasing the prices of their product whenever that is the economically necessary means of keeping ... revenues in proper balance; otherwise procurement of the vast sums necessary for the maintenance and expansion of their systems through equity and debt financing would become most difficult, if not impossible.

358 U.S. at 113, 79 S.Ct. at 200.[5]

■ Section 205(b) adds an independent prohibition against discrimination. It states:

(b) Preference or advantage unlawful.

No public utility shall ... (1) make or grant any undue preference or advantage

---

**5.** Although *Memphis* and *Mobile* deal with the Natural Gas Act, their reasoning and holdings are applicable to the Federal Power Act. *See Richmond Power & Light v. FPC,* 481 F.2d 490, 492–98 (D.C.Cir.), *cert. denied,* 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973). Sections 205 and 206 of the Federal Power Act have substantial counterparts in sections 4 and 5 of the Natural Gas Act, 15 U.S.C. §§ 717 *et seq.* (1976).

to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service. 16 U.S.C. § 824d(b) (1976). Section 205(b) requires that utility customers be treated fairly, but not necessarily equally.[6] *Towns of Alexandria v. FPC*, 555 F.2d 1020, 1028 (D.C.Cir.1977); *St. Michaels*, 377 F.2d at 915.

In the past, the Commission recognized that, taken together, the *Mobile-Sierra* and *Memphis* line of cases would inevitably create a situation where various customers would be charged different rates, depending upon whether their contracts were of the *Mobile-Sierra* or *Memphis* type. *Chambersburg*, 580 F.2d at 576; *Municipal Electric Utility Ass'n v. FPC*, 485 F.2d 967 (D.C. Cir.1973); *Indiana & Michigan Electric Co.*, 50 F.P.C. 16, 17 (1973). Moreover, whenever there is a class of customers, some of whom are guaranteed low rates by fixed-rate contracts while others, who are similarly situated but for a fixed-rate contract, are charged more, there is a tension between what *Mobile-Sierra* and *Memphis* permit and what section 205(b) appears to prohibit. *Town of Norwood v. FERC*, 587 F.2d 1306, 1310–11 (D.C.Cir.1978); *Chambersburg*, 580 F.2d at 577. The D. C. Circuit noted that where this occurs, (1) the lower, contractually fixed rate could be revised upward and offered to all customers; (2) the lower, contractually fixed rate could be offered to all customers; or (3) a difference in rates could be tolerated. Each alternative presents its own drawbacks. The first deprives the contracting party of a rate upon which it may have relied and undermines the purpose of fixed-rate contracts. The second may place a severe burden on the utility company.[7] Finally, the third sanctions a difference in treatment which must be reconciled with the Federal Power Act.

In *Chambersburg*, the D. C. Circuit resolved this conflict by allowing utilities with both *Mobile-Sierra* and *Memphis* contracts to increase rates under the *Memphis* contracts while respecting the fixed-rate provisions of the *Mobile-Sierra* contracts. The D. C. Circuit allowed the resulting rate disparity, finding that it was neither unreasonable nor unduly preferential under the terms of section 205(b). The court, however, limited its holding to situations in which there was a temporary difference in rates due solely to the existence of two different kinds of contracts. *"[N]othing else* [was] demonstrated;" and the court specifically "intimate[d] no view whatever concerning the additional factors necessary to constitute a violation of § 205(b)." 580 F.2d at 578 (emphasis in original). Thus, the mere presence of a *Mobile-Sierra* contract will not automatically shield discriminatory treatment from attack under section 205(b) of the Federal Power Act.[8]

---

6. If the Federal Power Act required equal treatment, it would create an almost impossible situation for a power company that decided to switch from fixed-rate contracts to going-rate contracts if the utility company had outstanding contracts with differing lengths. For example, in *Village of Rantoul v. FERC*, No. 80–1632 (D.C.Cir. July 10, 1981) (*mem.* ), *cited in Illinois Cities of Bethany v. FERC*, 670 F.2d 187 (D.C. Cir.1981), wholesale customers had entered into fixed-rate contracts with the Central Illinois Public Service Company at different dates. Since the contracts were of the same duration, they had different expiration dates. Rantoul, whose contract had expired, claimed that the proscription against undue discrimination entitled it to continued service at the fixed rate. The court rejected the claim. *Rantoul*, slip op. at 6.

7. The court in *Norwood* recognized that "[i]n some circumstances, this alternative may also have the effect of subtly disfavoring the once-favored customer with a fixed-rate contract. If we assume that that customer obtained the fixed-price clause via arm's-length bargaining, he presumably had to give something up for it. By generalizing his hard won fixed-price term among those who did not have to give anything up, a new species of discrimination may be created." 587 F.2d at 1311.

8. In *Public Service Co. of Ind.*, we noted that *Chambersburg* held that "rate differences caused by fixed-rate versus nonfixed-rate contracts do not violate § 205(b)." 575 F.2d at 1212 n.12. Since we recognized that there were factual distinctions between *Chambersburg* and this case, *Chambersburg* did not require "the conclusion that the rate disparity [in

In *Norwood*, the same court observed that

[w]here several customers have bargained with a utility over a period of time, it is quite likely that the contracts which result will differ. Customers' needs may vary, as will their general level of risk aversion and the types of risk to which they are most averse. They may have different projections about likely cost changes, technological advances, or demand fluctuations. And their bargaining power is likely to vary as well. *Chambersburg* stands for the proposition that when there is no reason to question what occurred at the contract formation stage, the parties may be required to live with their bargains as time passes and various projections about the future are proved correct or incorrect.

587 F.2d at 1312; *see Illinois Cities of Bethany v. FERC*, 670 F.2d at 189–191 (D.C. Cir.1981). In *Norwood*, the town alleged more than just the existence of two different types of contract; the town claimed that a fixed-rate contract awarded another similarly situated customer was a "sweetheart" arrangement negotiated while the parties to the contract were engaged in merger negotiations. The court remanded the proceeding to the Commission requiring it to investigate the allegations. The court noted that neither the *Mobile-Sierra* doctrine nor *Chambersburg* "permits a utility to use a fixed-rate contract as a device to render unassailable an otherwise prohibited undue preference." 587 F.2d at 1313.

### III.

In remanding this case to the Commission, we required Frankfort to "show that a substantial disparity in rates existed between customers of the same class. It then became incumbent upon PSCI to justify that disparity on the basis of factual differences." [9] *Public Service Co. of Indiana*, 575 F.2d at 1212. We also noted that, in considering the factual differences that justify a rate disparity, the Commission could consider

among other things the length of the contract since discounts can be justified on the basis of long-term requirements arrangements, the services that might be provided or excluded by either the seller or buyer, or *any factor* that might explain why a buyer did not bargain for a contract with a *Sierra-Mobile* clause in it when other comparable utilities successfully obtained such a clause.

575 F.2d at 1212 n.12 (emphasis added). The list was not exhaustive.

Frankfort first argues that rate discrimination is permissible only if justified by differences in cost or conditions of service. The city relies, in part, on *Western Union Telegraph Co. v. Call Publishing Co.*, 181 U.S. 92, 21 S.Ct. 561, 45 L.Ed. 765 (1901), *Otter Tail Power Co.*, 2 F.P.C. 134 (1940), and *Gulf States Utilities Co.*, 1 F.P.C. 522 (1938),[10] which indicate that a difference in price must be justified by a difference in cost or service. Appellant's reliance on *Western Union* as "the lodestar

this case was] justified under § 205(b) of the Act." *Id.* Although our holding today is consistent with *Chambersburg*, the inquiry on remand was somewhat broader than the court's inquiry in *Chambersburg*. We allowed the Commission to not only focus on what occurred at the contract formation stage, but also on any factual differences which would have justified the resulting disparity in treatment.

9. The D. C. Circuit appears to take a different view of the burden of proof when there is a rate differential in the *Mobile-Sierra* context. It places the burden on the going-rate customer to demonstrate factors which would constitute a violation of section 205(b). *Norwood*, 587 F.2d at 1311, 1313–14 n.21. We prefer placing the burden on the supplier to justify any substantial disparity on the basis of factual differences. Placing the burden on the utility company better fulfills the purpose of the Act and the company is in a better position to justify its rates since it has easier access to data which would support a price disparity.

10. Appellant also relies on recent decisions of the Commission, *see, e.g., Buckeye Power, Inc.*, No. EL79–20 (Order of Jan. 7, 1980); *Louisiana Power & Light Co.*, Nos. ER79–31, ER80–288, ER80–314 (Order of Aug. 7, 1980); as well as the legislative history of section 205(b). Upon considering this material, however, we find nothing that limits our consideration to cost or service-related differences.

for all cases such as this" is misplaced. *Western Union* involved differences in interstate telegraph charges, not differences in utility rates regulated by either the Natural Gas Act or the Federal Power Act. Moreover, in *Western Union*, the Supreme Court applied common law to hold that common carriers could not impose unreasonable rate differentials. 181 U.S. at 92, 21 S.Ct. at 561. Even if *Western Union* had come under a federal statute, the Supreme Court has observed that the Federal Power Act differs from other federal statutes such as the Interstate Commerce Act that governs the activities of common carriers and requires that all rates be uniform. Utility rates under the Natural Gas Act and the Federal Power Act do not have to be uniform. *Mobile*, 350 U.S. at 338, 76 S.Ct. at 377. Finally, the case did not present the question of how to deal with the situation that arises when certain customers have contractual protection and others do not.

*Otter Tail* and *Gulf States Utilities* also do not lend support to appellant's argument. In *Gulf States Utilities*, a power company had informed the Commission of its intent to offer a lower rate to its customers as their respective contracts expired. The Commission found that this procedure violated section 205(b).

> [T]o deny ... customers the benefit of the lower rate until their respective rate contracts expire will unduly prolong the present discriminations. Proper practice and the avoidance of undue discrimination requires, except in unusual cases, that once a new rate is adopted by a company it be made available and applied uniformly to all customers of the same class at the same time.

1 F.P.C. at 524. In *Otter Tail*, a power company sought to justify the different rates charged its municipal customers on the basis of their population sizes and the results of "individual negotiation and bargaining between the [company] and the municipality ... involved." 2 F.P.C. at 142. The Commission found that since there was "no substantial variation in the service conditions or in the characteristics of the delivery and sale of energy to these customers," and since there was "no evidence in the record whatever indicating that the cost ... to any one of these customers differs," the company was in violation of section 205(b).

Both *Otter Tail* and *Gulf States Utilities* preceded the development of the *Mobile-Sierra* rule in 1956. Neither case presented the situation where certain customers had contractual protection and others did not. Since *Mobile-Sierra* has "the effect of dictating different rates to customers otherwise similarly situated," *Indiana & Michigan Electric Co.*, 50 F.P.C. 16, 17 (1973), the Commission has recognized that its earlier holdings in *Otter Tail* and *Gulf States* must be modified.[11]

■ In considering whether factual differences justified the rate disparity in this case, the Commission was not limited to cost or service-related factors. Differences in cost will normally provide the best justification for differences in prices;[12] and the vendor may carry a heavy burden to justify different rates for what appears to be identical service. *Buckeye Power, Inc.*, No. EL79-20 (Order of Jan. 7, 1980) at 5. The standard of due and reasonable differences is met, however, when there are differences in facts—cost of service or otherwise—that justify the rate disparity. *Public Systems v. FERC*, 606 F.2d 973 (D.C.Cir.1979); *St. Michaels*, 377 F.2d at 915; *Louisiana Power & Light Co.*, Docket Nos. ER79-31, ER80-284, ER80-314 (Order filed Aug. 7, 1980). Thus, in giving examples of what the Com-

---

11. Nonetheless, the court in *Chambersburg* noted that *Otter Tail* and *Gulf States* may have some continuing vitality since unilateral rate increases, even if permitted by contract, might be limited by the factors set out in the two cases. *Chambersburg*, 580 F.2d at 577.

12. No cost related justification was introduced before the Commission in this case. In fact, the witnesses and exhibits disclosed that the population, number of electric customers, annual kilowatt hours sold, operating revenues, date of peak load, and kilowatts of peak load among the Interconnected Cities are quite similar.

mission could consider on remand, we included factors which are not cost-related. The Commission properly affirmed the ALJ's finding that the rate differential was justified by "a change in [company] policy which discontinued the use of fixed rate contracts, combined with Frankfort's failure to execute a fixed rate contract during the period one was available."[13]

It is important to note that the company's decision not to enter into any new fixed-rate contracts was a legitimate exercise of its prudent business judgment. There was sufficient evidence to indicate that PSCI's costs were rising[14] and the company's flexibility in being able to renegotiate its contracts became a serious concern. There was no evidence that the Company applied the policy selectively or arbitrarily; Frankfort was simply the first customer to be affected following the change in policy.[15]

## IV.

In *Public Service Co. of Ind.*, we expressed some concern about what effect the disparity of prices would have on Frankfort's ability "to attract new industry to their community by virtue of their increased wholesale rate." 575 F.2d at 1211–13 & nn.11, 12, 13. The purpose of section 205(b) is to protect consumers such as Frankfort from being placed at a competi-

tive disadvantage with respect to other like localities. *Id.* at 1212; *Towns of Alexandria*, 555 F.2d at 1028; *St. Michaels*, 377 F.2d at 915. We noted that a customer has recourse to the Commission under section 205(b) when it is put in an "*unjustifiably non-competitive position.*" *Public Service Co. of Ind.*, 575 F.2d at 1313 (emphasis added).

Evidence of competitive harm is relevant to this appeal in two related, but separate, ways. First, evidence of competitive harm is relevant in determining whether the disparity in treatment is unduly discriminatory, *despite* factual differences. This would be the case, for example, if factual differences did not relate to or justify a difference in treatment. On remand, we therefore emphasized that "the factual differences [must] justify the specific rate differences permitted." *Public Service Co. of Ind.*, 575 F.2d at 1212. Although the Commission did not specifically find that the differences cited justified the extent of the rate disparity, it was implicit in their reasoning.[16]

Secondly, if there were no factual differences to justify the disparity in treatment, evidence of competitive harm would be relevant to gauge the extent of the remedy for undue discrimination. In *Public Service Co. of Ind.*, the question on remand,

---

13. In *Village of Rantoul v. FERC*, No. 80–1632 (D.C.Cir. July 10, 1981) (*mem.*), *cited in Illinois Cities of Bethany v. FERC*, 670 F.2d 187 (D.C. Cir.1981), the going-rate customers, like Frankfort, "were offered and rejected the now favorable contract terms." *Bethany*, at 194 n.20. The court found that, having rejected the offer, they were not entitled to the fixed rate.

14. Frankfort argues that the policy change was not motivated by a concern over rapidly rising costs. The city points to the fact that from the time Logansport executed its fixed-rate contract to the time Frankfort requested a contract (seven months later), there were no differences which justified the denial of a fixed-rate contract. Moreover, PSCI charged Frankfort the same rate as the other Interconnected Cities for the next three years. While this may detract from our finding that the policy change was motivated by a rise in costs, it may be that the company projected dramatically increasing prices. Moreover, other customers may have

been carrying more of the burden until the fixed-rate contracts held by the Interconnected Cities terminated.

15. After August, 1971, no one was able to bargain for a fixed-rate clause. In fact, since that time, almost no new long-term rate contracts have been offered by *any* electric utility.

16. A number of factors persuade us that competitive harm did not render the rate disparity undue. If Frankfort were so competitively harmed, we question why it did not take advantage of various opportunities it had to reduce its cost or reduce its reliance on its own costly self-generation. Moreover, the other Interconnected Cities had a contractually-based rate advantage that would last only about four years. Finally, the cost of electricity is only one factor among many which is relevant in attracting industry to the area.

however, was not whether there had been any competitive harm [17] or the extent of such harm; rather, the question was whether there were factual differences which justified the rate disparity. Since the Commission found sufficient differences to justify the disparity in treatment, we need not now consider the extent of any competitive harm.

### V.

Finally, Frankfort contends that since the Commission affirmed, but did not explicitly adopt the decision of the Administrative Law Judge, the basis and reasoning of the Commission's decision is not known.[18] The city contends that this constitutes error because it violates our earlier remand which required the Commission to "show not only that factual differences justify some rate differences, but also that the factual differences justify the specific rate differences permitted." *Public Service Co. of Ind.*, 575 F.2d at 1212. Moreover, Frankfort contends that it constitutes error because a summary affirmance violates the Commission's own regulation which requires all decisions to "include a statement of . . . findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law or discretion presented in the record . . . ." 18 C.F.R. § 1.30. Finally, it argues that the Commission's failure to state the basis of its decision constitutes error because it violates section 4(a) of the Administrative Procedure Act.[19]

 It is unnecessary to address appellant's contention that there is a difference between "affirm" and "adopt." If Frankfort's argument with respect to this alleged technical deficiency is correct, the general rule would call for a remand to the agency for a statement of the reasons and basis for its decision. Where the agency would have made only one finding of fact, however, the court may act without remand. *See, e.g., B. D. Click Co. v. United States*, 614 F.2d 748, 755 (Ct.Cl.1980). Frankfort concedes that this is such a case.

 Moreover, the purpose behind requiring the Commission to state the basis for its conclusions is to lay out its reasoning to facilitate appellate review. In affirming the ALJ's decision in its entirety, the Commission intended that the ALJ's opinion would serve this function. Congress has indicated that in reviewing agency decisions, "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706 (1976). Frankfort can show no prejudice from the Commission's failure to include the word "adopt." We find the decision and reasons given in the ALJ's decision are those of the Commission.

### VI.

Although the rate PSCI charged to Frankfort was higher than to the other Interconnected Cities, there were sufficient factual differences to justify the disparity. The Commission complied with our remand in *Public Service Co. of Ind.* and its order is hereby affirmed.

---

17. The Commission conceded that Frankfort would be significantly injured by the disparity of rates. *Public Service Co. of Ind.*, 575 F.2d at 1212 n.12.

18. On January 26, 1981, the Commission entered its order on remand. In its entirety, that order states: "The initial decision is affirmed and the proceeding is terminated."

19. Section 4(a) of the APA requires that all agency decisions include a statement of findings, conclusions, and the basis for those findings and conclusions. 5 U.S.C. § 557(c)(A) (1976).