PUBLIC SERVICE COMPANY OF INDIANA, INC., Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Crawfordsville, Frankfort, Logansport, Peru, and Washington, Indiana, and Indiana Municipal Electric Association and "IMEA Cities," Intervenors.

CITY OF CRAWFORDSVILLE, INDIANA, City of Frankfort, Indiana, City of Logansport, Indiana, City of Peru, Indiana and City of Washington, Indiana, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Hoosier Energy Division of Indiana Statewide Rural Electric Cooperative, Inc. and Public Service Company of Indiana, Inc., Intervenors.

WABASH VALLEY POWER ASSOCIATION, INC., et al., Petitioners,

Hoosier Energy Division of Indiana Statewide Rural Electric Cooperative, Inc., Intervenor,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Public Service Company of Indiana, Inc., Intervenor.

INDIANA MUNICIPAL ELECTRIC ASSOCIATION et al., Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Public Service Company of Indiana, Hoosier Energy Division of Indiana Statewide Rural Electric Cooperative, Inc., Intervenors.

PUBLIC SERVICE COMPANY OF INDIANA, INC., Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Wabash Valley Power Association, Inc., et al., Intervenors.

Nos. 77–1238, 77–1349, 77–1351, 77–1391 and 77–1586.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 23, 1978.

Decided April 27, 1978.

William C. Wise, George F. Bruder, Washington, D. C., for Public Service of Indiana.

Peter K. Matt, Washington, D. C., for Ind. Municipal Electric.

James D. Pembroke, Washington, D. C., for City of Crawfordsville, Ind.

Joseph G. Stiles, Washington, D. C., for Fed. Energy Regulatory Comm.

Before CUMMINGS, SPRECHER and BAUER, Circuit Judges.

SPRECHER, Circuit Judge.

At issue in this appeal is the validity of various Federal Power Commission (FPC)[1] decisions that served as bases for its determination of the "just and reasonable" wholesale rate that could be charged by an Indiana electric utility company, the Public Service Company of Indiana, Inc. (PSCI). Although a large number of issues are raised by the various parties, some of the more important ones are how the FPC should treat disparities in contractually-fixed versus FPC-imposed rates charged to different members of a class of customers, what constitutes a reasonable rate of return on equity and what the FPC should do about estimated future costs submitted by a utility under new Commission regulations that actual experience proves were not incurred by the utility.

I

Involved in this case are five consolidated appeals from the FPC's determination of the "just and reasonable" rates that PSCI could charge its wholesale customers under sections 205[2] and 206[3] of the Federal Power Act, 16 U.S.C. §§ 824d and e. PSCI is a large electric utility that provides retail service to 69 counties in Indiana and wholesale service to 60 utility customers. Wholesale customers are divided into four groups, each of which was represented both before the FPC and in this appeal.

The first and largest wholesale customer is the Hoosier Energy Division of the Indiana Statewide Rural Electric Cooperative, Inc. (Hoosier). The cooperative generates some of the electrical power that it distributes to its members, but it also purchases partial requirements service from PSCI for resale to its members.

The second and third customers are the Wabash Valley Power Association (Wabash) and the Indiana Municipal Electric Association (IMEA). Both customers have no electrical generating facilities and therefore both purchase full requirements service from PSCI.

The fourth customer is a class of municipal purchasers each of which has some generating capacity, but each purchases partial requirements from PSCI. The cities involved are Crawfordsville, Logansport, Peru, Washington and Frankfort, Indiana.

On January 8, 1974, PSCI in two separate proceedings[4] filed proposed rate increases for services to its wholesale customers that ranged from 14 percent for Wabash to 32 percent for the Cities. In support of these increases, PSCI filed all data required by

1. Pursuant to the provisions of the Department of Energy Organization Act, Public Law 95–91, 42 U.S.C. § 7101 et seq. (August 4, 1977), and Executive Order No. 12009, 42 Fed.Reg. 46267 (September 13, 1977), the Federal Power Commission ceased to exist on September 30, 1977, and most of its functions and regulatory responsibilities were transferred to the Federal Energy Regulatory Commission, which, along with the Department of Energy, was activated on October 1, 1977. Section 705(e) of the Organization Act, 42 U.S.C. § 7295, provides for the substitution of the new Commission as a party in cases such as this.

2. Section 205(a) provides in relevant part:
 (a) All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission . . . shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.
 16 U.S.C. § 824d(a).

3. Section 206(a) provides in relevant part:
 (a) Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any . . . contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.
 16 U.S.C. § 824e(a).

4. PSCI filed a revised rate schedule for Hoosier that was to become effective on March 9, 1974. Its docket number was E–8586. On the same day PSCI also filed revised schedules and tariffs to increase rates for the other wholesale groups that were to become effective on May 15, 1974. These filings were docketed as E–8587.

the FPC's then newly-promulgated regulations, 18 C.F.R. § 35.13(b)(4)(iii), which included actual cost data for 12 months ending June 30, 1973 (Period I) and estimated cost data for the calendar year 1974 (Period II).[5]

It would unduly extend the length of this opinion to attempt to describe with any specificity the administrative proceedings conducted in response to PSCI's proposed rate increase that led to the decisions at issue in this appeal. Therefore, we will merely sketch the various proceedings at this point and will describe more fully the specific facts necessary to decide each issue as we review them in the subsequent sections of this opinion.

On March 7, 1974, the FPC approved, subject to refund, the rate increase to Hoosier; rejected the rate increase for four of the five Cities based on their fixed-rate contracts with PSCI, but instituted a proceeding under section 206 of the Act to determine whether the contracts were in the public interest; and suspended the rate increase to all other wholesale customers for the statutory maximum of five months, 16 U.S.C. § 824d(e), after which the rates would go into effect subject to refund.

In November 1974, a consolidated hearing was held before an administrative law judge (ALJ), with all of the parties in this appeal participating. The ALJ's initial decision was issued in March 1976. In that decision the ALJ essentially approved PSCI's proposed rate increase and held that the fixed-rate contracts of the four Cities violated section 206.

In response to various exceptions taken to the ALJ's opinion, the FPC held oral argument in July 1976. On November 10, 1976, the FPC in Opinion No. 783 disallowed, in part, PSCI's proposed rate increase and reversed the ALJ's modification of the fixed-rate contracts held by the four

Cities. Petitions for rehearing were filed by various of the parties and on February 25, 1977, the FPC issued Opinion No. 783-A which generally denied rehearing, but did eliminate certain of PSCI's estimated power costs that in fact were not incurred.

In September 1975, PSCI tendered for filing a superseding proposed rate increase to its wholesale customers with a proposed effective date of October 24, 1975. The FPC suspended the proposed rate increase until March 31, 1976, when it was to go into effect subject to refund. Thus, the rates under review in this proceeding apply to the locked-in period of October 15, 1974, to March 31, 1976.

As noted earlier, five separate appeals were taken from the FPC's two opinions and they have been consolidated into a single appeal. This court properly has jurisdiction over these appeals based on section 313 of the Federal Power Act, 16 U.S.C. § 825*l*.

Quite a few issues have been raised in these consolidated appeals, some of which are basically unrelated to others and many of which are discussed by several parties. In reviewing these issues we will initially consider the problems created by the fixed-rate contracts held by the Cities. Second, we will review the propriety of the rate of return on equity the FPC approved. Finally, we will review the various FPC cost-of-service decisions about which complaints are raised by the various parties.

## II

One cluster of issues surrounds the FPC's treatment of the fixed-rate contracts between PSCI and the Cities. The Cities contend that the FPC erred in holding that PSCI could unilaterally seek a rate change from the Commission for electricity sold to Frankfort, Indiana because the sale of that

5. The District of Columbia Circuit has noted that the regulations requiring estimated costs were adopted in order to provide the FPC with data that would be " 'more suitable for the determination of rates for future use . . .' " *American Public Power Ass'n v. FPC*, 173 U.S. App.D.C. 36, 38, 522 F.2d 142, 144 (1975). The

court in that case approved the adoption of those regulations as being consistent with the Federal Power Act. Although we are not asked to reconsider the validity of its regulations, this is one of the first appellate court decisions reviewing the implementation of these regulations.

electricity was subject to a fixed-rate contract within the meaning of *United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956). Alternatively, the Cities argue that, even if Frankfort did not have a fixed-rate contract with PSCI, it was an undue discrimination in violation of section 205(b) of the Federal Power Act, 16 U.S.C. § 824d(b), to permit PSCI to increase its rates to Frankfort above what the other four Cities were paying. PSCI responds that the FPC properly permitted the rate increase for Frankfort, but erred in refusing to reform the fixed-rate contracts of the other four Cities so as to put their rates in line with Frankfort's. We will consider each contention in turn.

■ The general rule with regard to fixed-rate contracts is that they are valid unless clearly contrary to the public interest and that they preclude a utility from unilaterally seeking to increase its rates under section 205 of the Federal Power Act to customers with such contracts. *United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 337, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 353, 76 S.Ct. 368, 100 L.Ed. 388 (1956). Thus, in a case such as this where the customer claims to have a fixed-rate contract, our focus must be on the terms of the contract, *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division,* 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958),

based on the standard that "[r]ate filings consistent with contractual obligations are valid; rate filings inconsistent with contractual obligations are invalid." *Richmond Power & Light v. FPC,* 156 U.S.App.D.C. 315, 318, 481 F.2d 490, 493 (1973).[6] *See also Appalachian Power Co. v. FPC,* 174 U.S. App.D.C. 100, 529 F.2d 342 (1976).

■ Applying that test to this case, it seems to us that a unilateral rate filing under section 205 was unambiguously provided for in the contract between PSCI and Frankfort. In Article 12.1 of the contract, it is provided:

> The terms and conditions of this Agreement, and the provisions of the rates attached hereto and made a part hereof, may be changed by the Company from time to time by filing such change(s) with the Federal Power Commission and upon receipt of such Commission's acceptance for filing will supersede and cancel the present terms and conditions of this Agreement and such rate provisions.

The Cities argue that this Article only has significance once the parties mutually agree to a rate change as provided in Article 2[7] or have a change through arbitration as provided in Article 11[8] of the contract. A glance at Article 2 reveals, however, that an exception to the requirements of mutual agreement and arbitration is expressly provided for terms and conditions subject to

---

6. Contrary to the suggestion of the FPC at oral argument, this court is at least as capable of interpreting the effect of this contract as the Commission. As much of this opinion amply demonstrates, courts must accord substantial deference to the expertise of the Commission. However, not every decision made by the FPC requires judicial deference merely by having been decided in the context of a rate-making proceeding. The FPC's contract interpretations should only be deferred to when they are "amply supported both factually and legally." *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division,* 358 U.S. at 114, 79 S.Ct. at 201.

7. Article 2 provides:
 Inasmuch as the specific services to be rendered in furtherance of such purpose will vary from time to time during the duration of this Agreement, and the terms and conditions

applicable to such services may require modification from time to time, it is intended that such specific services and the terms and conditions applicable thereto will be set forth in service schedules mutually agreed upon between the parties. Subject to the provisions in Article 12 hereof, such service schedules, until and unless changed by such mutual agreement, shall be those provided by Section 2.3 hereof. Each such service schedule shall be deemed a part of this Agreement during the period of its duration.

8. Article 11 provides in relevant part:
 11.1 In case the parties shall be unable to agree upon any question arising hereunder, such question shall be referred to three arbitrators, one appointed by the City, one appointed by the Company, and the third appointed by the two others so chosen.

Article 12. The only reasonable way to interpret the contract is that terms and conditions within the FPC's jurisdiction, including rates, are subject to unilateral change by a filing approved by the Commission, and all other changes in terms and conditions of service are subject to mutual agreement or binding arbitration. None of the cases relied on by the Cities involve contractual provisions anywhere near as unambiguous as those involved in this case.[9] We therefore hold that the FPC correctly determined that PSCI's rate filing could be considered in a section 205 proceeding.

### III

After the FPC held that it was proper for PSCI to file unilaterally for a rate increase for its service to Frankfort, a hearing was held after which the Commission concluded that PSCI could increase its rates for service to Frankfort. The effect of that decision was to permit PSCI to treat one partial requirements customer differently from all of the other customers within that service class.[10] The Cities maintain that this disparity of treatment constitutes a violation of section 205(b) of the Federal Power Act, which provides:

No public utility shall . . . (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities,

or in any other respect, either as between localities or as between classes of service. 16 U.S.C. § 824d(b).

While it is plain that there is a substantial disparity in the rates charged to Frankfort as opposed to the other four Cities, that fact does not mean that there has been an undue or unreasonable discrimination. "[D]ifferences in rates are justified where they are predicated upon differences in *facts* . . . ." *St. Michaels Util. Comm'n v. FPC,* 377 F.2d 912, 915 (4th Cir. 1967) (emphasis added). Thus, an appellate court's review is limited to determining "whether the record exhibits factual differences to justify . . . differences among the rates charged. . . ." *Id.* Even under this restricted standard of review, however, we conclude that the FPC failed to satisfy its statutory obligation under section 205(b).

All the FPC did in this case was determine initially that the existence of a contract constitutes a factual difference within the meaning of *St. Michaels Util. Comm'n, supra* and then held that the general rates when applied to Frankfort were "just and reasonable." (Opinion No. 783 at 12–13). The FPC's analysis satisfied section 205(a)'s requirement that all rates must be just and reasonable, but it is not responsive at all to the question under section 205(b) of whether the factual difference, *viz.,* the contract, justifies the quite substantial rate differential charged to Frankfort compared with that charged to the other Cities.[11] These standards are "twin

---

9. In this regard the Cities place primary reliance on the opinion in *Sam Rayburn Dam Electric Cooperative v. FPC,* 169 U.S.App.D.C. 281, 515 F.2d 998 (1975), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976). In that case the court in reviewing a contract that even the parties to it conceded "leaves much to be desired" in terms of draftsmanship held that extrinsic evidence could be used to prove the intent of the parties. The case is therefore factually distinguishable because there is no ambiguity in the contract before us. In our view of this contract, no amount of extrinsic evidence could alter the plain meaning of Article 12.

10. The ALJ found that "The Five Interconnected Cities, each having generation facilities of its own and taking part of its requirements

under an interconnection agreement with PSCI, comprise a proper group or class for rate-making purposes." (R. at 4474). Nothing in the FPC's opinion disputes that finding.

11. That the interests of Frankfort may be injured was recognized expressly by the FPC when it concluded that "the citizenry of Frankfort may suffer an inability to attract new industry to their community by virtue of their increased wholesale rate." (R. at 4791–92). The FPC concluded, however, that it was not its responsibility to worry about that problem. (R. at 4792). It may be that the FPC merely intended that remark to apply to its review under § 206 of the Act. *See* part IV of this opinion *infra.* Surely, it would be difficult to square the FPC's narrow view of its responsi-

objectives" of the Act, *Towns of Alexandria, Minnesota v. FPC,* 181 U.S.App.D.C. 83, 94, 555 F.2d 1020, 1031 (1977), and the Commission must consider them separately and demonstrate that both requirements have been satisfied. Section 205(b)'s purpose is to protect consumers such as Frankfort from being placed at a competitive disadvantage with other localities such as the Cities. *St. Michaels Util. Comm'n, supra* at 915; *Towns of Alexandria, supra,* 181 U.S.App.D.C. at 91, 555 F.2d at 1028. That the rates Frankfort is charged are reasonable in some general sense does not protect its position vis-à-vis the other Cities.

In our view, all that Frankfort was required to do was show that a substantial disparity in rates existed between customers of the same class. It then became incumbent on PSCI to justify that disparity on the basis of factual differences. The FPC in its opinion must show not only that factual differences justify some rate differences, but also that the factual differences

justify the specific rate differences permitted. The FPC did not purport to make that showing in its decision, and thus we must remand to the Commission for further consideration consistent with this opinion.[12]

## IV

■ Although the FPC concluded that the contractually fixed rates of four of the Cities could not be altered by PSCI's unilateral filing, it still decided that the rates under those contracts could be reviewed in a proceeding under section 206(a) of the Federal Power Act, 16 U.S.C. § 824e(a). After an investigation on that issue, the Commission concluded that the public interest did not require reformation of the fixed-rate contracts.

PSCI contends that the FPC's decision is inconsistent with the Supreme Court's decision in *FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). In that case, the Court established the stan-

---

bilities with the language of § 205(b) that makes it unlawful for a utility subject to FPC jurisdiction to charge unreasonable differences in rates "as between localities."

The only comment at all relevant to the issue of factual differences justifying the rate differences in the FPC's opinion is that Frankfort "failed . . . to show that different considerations should apply to its increased rates . . . because of its lower rates charged by PSCI to wholesale customers of the same class." *It seems to us that § 205(b) by itself supplies those considerations.*

12. The District of Columbia Circuit has recently held that rate differences caused by fixed-rate versus non-fixed-rate contracts do not violate § 205(b). *Boroughs of Chambersburg & Mont Alto, Pa. v. FERC,* No. 77–1081 (D.C.Cir., April 3, 1978) (per curiam). In so holding, the court relied heavily on the Supreme Court's statement in *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div., supra,* 358 U.S. 103, 113, 79 S.Ct. 194, 200, 3 L.Ed.2d 153 that utilities "should not be precluded by law from increasing the prices of their product whenever that is the economically necessary means of keeping the intake and outgo of their revenues in proper balance . . . ." Of course, in the *Memphis* case there was no discrimination issue.

We, however, do not dispute the general proposition quoted above and nothing in our decision precludes a utility from increasing its rates to a customer without a fixed-rate con-

tract. The only issue is how much that increase should be. All that our decision requires is that in making that determination the FPC should not ignore its responsibility to the consumer under § 205(b).

We note also that there are at least two factual distinctions between *Boroughs of Chambersburg* and our case. First, in this case there is only one customer in an actual class of customers that is being disadvantaged. In *Boroughs of Chambersburg,* there was only one utility receiving the benefits of a fixed-rate contract. Second, in our case the FPC conceded that Frankfort, Indiana would be significantly injured by the disparity of rates. No similar finding is mentioned in the District of Columbia Circuit's opinion.

For these reasons, we are not persuaded that *Boroughs of Chambersburg* requires the conclusion that the rate disparity permitted in this case has been factually justified under § 205(b) of the Act.

In considering the factual distinctions that justify rate differences, the FPC might consider among other things the length of a contract since discounts can be justified on the basis of long-term requirements arrangements, the services that might be provided or excluded by either the seller or buyer, or any factor that might explain why a buyer did not bargain for a contract with a *Sierra-Mobile* clause in it when other comparable utilities successfully obtained such a clause.

dards for Commission proceedings under section 206. The Court held:

> [T]he sole concern of the Commission would seem to be whether the rate is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory.

Id. at 355, 76 S.Ct. at 372. PSCI acknowledges that the first two tests are not violated by these fixed-rate contracts. It argues, instead, that there is a clear, factually unjustified disparity in allowable rates that might adversely affect Frankfort,[13] and thus the contracts of the other four Cities should be reformed. We disagree.

We have already concluded that for purposes of section 205 the difference between the rates charged to Frankfort and the other Cities may be excessively discriminatory. That conclusion does not require, a fortiori, the conclusion that the rates are unduly discriminatory under section 206. The purpose behind section 205(b) is the protection of the consumer's interest, St. Michael Util. Comm'n, supra at 915, and the purpose behind section 206 is the protection of the public interest. Sierra Pacific, supra. Discriminatory rates that are inconsistent with the interests of a consumer need not be inconsistent with the public interest.

In our view the anti-discrimination policy in section 205(b) is violated in a case such as this where one consumer has its rates raised significantly above what other similarly-situated consumers are paying. In such a case, the lone consumer would be placed in an unjustifiably non-competitive position, and thus should have recourse to the FPC under section 205(b). Section 206's ban on discrimination may be breached in a case where one consumer is afforded, without any factual justification, a contract rate that is significantly lower than the pre-existing rates for all other members of the

class. In that case the public interest in avoiding blatant favoritism by a regulated utility and in protecting the vast majority of the class of consumers may require the FPC to find a violation of section 206.

This approach seems to us to best effectuate the policy expressed in United Gas Pipe Line Co. v. Mobile Gas Service Co., supra, that rate contracts generally should be enforced, absent a very clear showing of injury to the public interest. The FPC correctly concluded that no such showing was made on the record in this case. Therefore, we conclude that section 206 was not violated by the FPC's decision not to reform the Cities' fixed-rate contracts.

## V

■ As is to be expected, one of the central issues raised by all of the petitioners is the validity of the rate of return on equity approved by the FPC. While PSCI claims in 77–1238 that it is confiscatory, its customers claim in 77–1351 that it is excessive. The FPC, of course, claims that the rate of return is just right. We will consider first PSCI's argument, and then we will discuss the contentions of its customers.

The FPC determined that a 13.00% rate of return on equity and an 8.51% overall rate of return on PSCI's rate base were both just and reasonable. In so holding the FPC rejected the ALJ's determination that a 13.60% return on equity and an overall 8.73% return were appropriate. The Commission rejected the ALJ's method of calculation that considered first what a reasonable dividend should be and then worked back to determine what rate of return would provide that dividend. The FPC reasoned that such an approach unduly emphasized the interests of investors because it guaranteed them returns on their capital at the expense of higher prices to the customers.

---

13. It is somewhat incongruous for PSCI to argue as to the best interest of Frankfort. It, nonetheless, has helped to make a persuasive showing that that community might be injured by the rate disparity in a way that could violate

§ 205 of the Act. See part III of this opinion supra. While our decision potentially lowering the rates charged to Frankfort is not what PSCI has requested, it should at least assuage its concerns about Frankfort's citizenry.

PSCI, however, argues that the ALJ's method is the only one that can satisfy the Supreme Court's "end result" test adopted in *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944). In this regard, PSCI focuses on the Court's conclusion that "[t]hat return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." *Id.*[14] Obviously, a rate of return that focuses on providing a minimum dividend to investors should succeed in attracting capital. It does not follow, however, that because a method of calculating rate of return fails to focus on a specific dividend figure that the method is "confiscatory" or even that it creates doubts about the calculated rate's ability to attract capital.

The FPC was quite sensitive to the ability of PSCI to attract capital. In arriving at its ultimate rate determination, the Commission made the following observations relevant to PSCI's financial well being:

> The evidence in this record generally shows that PSCI presently enjoys a strong reputation in the capital markets. PSCI has common stock ratings of "high grade" (Moody's) and "A" (Standard & Poor's) as well as Mortgage bond ratings of AA (Moody's) and Aa (Standard & Poor's) and a preferred stock rating of AA (Standard & Poor's). . . .

> Moreover, it does not appear that PSCI's capitalization ratios would warrant the inference that the company will be perceived as increasingly risky to the investment community. PSCI's common stock continues to sell above book value in sharp contrast to other electric utilities' performance in recent years. And PSCI's percentage of net income for common represented by its AFUDC is substantially below many other utilities in the industry.

(R. 4836–37). We have no doubt that the FPC's analysis satisfied the *Hope* Court's requirement that the Commission be cognizant of the capital-attracting effects of the rate of return on the regulated company.

Moreover, PSCI has mischaracterized the *Hope* decision. Contrary to PSCI's assertion, the opinion does not accord a place of preeminence to the interests of actual and prospective investors. Instead, the opinion squarely recognizes that "[t]he rate-making process under the Act . . . involves a *balancing* of the investor and the consumer interests. . . . '[R]egulation does not insure that the business shall produce net revenues.'" 320 U.S. at 603, 64 S.Ct. at 288 (emphasis added). *See also Permian Basin Area Rate Cases*, 390 U.S. 747, 791, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). That PSCI did not receive all that it had wanted for its investors is to be expected since their interests amount to only a portion of the public interest that the FPC is statutorily required to protect in its rate-making decisions. We conclude on the record before us that the Commission provided amply for investors in its 13% rate of return on equity.

## VI

 Wabash in 77–1351 and the Cities in 77–1349 argue on behalf of PSCI's customers that the 13% return on equity is not supported by substantial evidence and Wabash argues that the rate conflicts with rates of return allowed in other cases by the FPC. We find that both contentions are meritless. Several witnesses testified as to the appropriate rate of return. Some stated that rates exceeding 13% were necessary and some said rates less than 13% were necessary. When the testimony is in such conflict, the FPC is the appropriate body to choose an exact rate that is within a range of reasonable rates. *See Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 251, 71 S.Ct. 692, 95 L.Ed. 912 (1951). It evaluated quite carefully the financial condition of the electric utility in-

---

14. PSCI also relies on the Court's statement that "it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and *dividends* on the stock." 320 U.S. at 603, 64 S.Ct. at 288 (emphasis added). We do not interpret the Court's specific reference to dividends as requiring the approach taken by the ALJ in this case.

dustry, the unique capital-attracting features of PSCI and its future capital needs in adjusting the rate of return on equity from the various recommendations that had been made to it. The sensitive balancing of the various relevant considerations is exactly what the Supreme Court has required in *Bluefield Waterworks & Improvement Co. v. Public Serv. Comm'n*, 262 U.S. 679, 692, 43 S.Ct. 675, 67 L.Ed. 1176 (1923) and *FPC v. Hope Natural Gas Co., supra.* Certainly PSCI's customers have not met their "heavy burden of making a convincing showing that it [the rate] is unjust and unreasonable in its consequences." *FPC v. Hope Natural Gas Co., supra*, 320 U.S. at 602, 64 S.Ct. at 288.

Wabash also asserts that a 13% rate of return was unreasonable because it is in excess of rates permitted other comparable utilities. First, Wabash fails to cite any specific examples, and thus we have no way of knowing whether the cases in fact involve any utility with a financial status comparable to PSCI's. Second, the FPC's recent decisions show that a 13% rate of return is not out of the ordinary. *See Nevada Power Co.*, Opinion No. 763 at 9–14 (July 7, 1976) (14% rate of return); *New England Power Co.*, Opinion No. 803 at 58–59 (June 6, 1977) (13.5% rate of return); *Public Service Co. of Oklahoma*, Opinion No. 788 at 8–12 (Feb. 17, 1977) (12.5% rate of return). In fact, the FPC in the *New England Power* case specifically compared the rates of return allowed to Nevada Power, New England Power and PSCI. The Commission found that Nevada "was clearly in more serious financial difficulty than" New England and that PSCI "was not experiencing the financial difficulties encountered by" New England. *New England Power Co., supra* at 59. We find nothing

that supports Wabash's contention that PSCI's rate of return is unusual. To the contrary, the FPC has taken pains to avoid allowing a rate of return that is out of the ordinary when compared with other cases. We therefore affirm the FPC's determination that 13% is a just and reasonable rate of return on equity and 8.51% is a just and reasonable overall rate of return.

## VII

One of the costs of service that PSCI estimated in its filing for a rate increase was $15,113,000 for purchased power costs for 1974.[15] This estimate was based on contracts PSCI had with other utilities [16] for the purchase of electricity and on its forecast that it would not have any excess capacity from which to sell electricity to any other utility.

At the hearing before the ALJ, however, PSCI's cost of service witness testified that experience in early 1974 if projected through the rest of the year indicated that PSCI's net purchased power expense probably would be zero (R. at 513). This deviation from the estimated cost was caused by a drop in demand by PSCI's retail customers creating an unanticipated excess generating capacity which was sold both to utilities in the New England states that had a huge energy demand due to the Arab oil embargo and to neighboring utilities that wanted to save coal in anticipation of a coal miner's strike. Ultimately, PSCI became a net seller of electricity in the sum of $2,149,000 for 1974.

Notwithstanding the remarkable deviation between the estimated and actual purchased power costs, the FPC in Opinion No. 783 did not disturb PSCI's cost estimate.[17] After rehearing, however, the Commission

---

15. PSCI's period I actual purchased power data for 1973 showed a net credit of $7,632,000.

16. PSCI is a party to the Kentucky-Indiana Pool Planning and Operating Agreement which is an arrangement among several large electric generating utilities to sell power among themselves to reduce temporary excesses or shortages in generating capacity in individual systems.

17. In fact, the FPC concluded that

it would entirely defeat the purpose of the projected test period concept to allow the wholesale reworking of the filing utility's estimated costs in light of subsequently discovered actual costs.

(R. at 4800).

changed its view and in Opinion No. 783–A held that although the estimates were not unfounded or arbitrary at the time they were submitted there was still "substantial evidence in their record for the Commission to assign a purchased power expense of zero. . . . " (R. at 4988).

PSCI does not contest the FPC's conclusion that its estimated purchased power cost was unreasonably high, but instead complains on several grounds about the Commission's failure to consider the synchronizing cost adjustments that would be necessary due to the "selective" removal of the one cost estimate. We find none of PSCI's arguments on this issue to be persuasive and therefore affirm the FPC's conclusion that the appropriate purchased power expense is zero.

PSCI contends that the FPC's actions violate its long-standing policy against making "spot" adjustments. This argument overlooks the fact that these proceedings were conducted under a new set of regulations. Those regulations require the filing utilities "to establish the validity and accuracy for *each* of their cost estimates." Order No. 487, 50 F.P.C. 125, 127 (1973), aff'd, *American Public Power Ass'n, supra,* 173 U.S. App.D.C. 36, 522 F.2d 142. Since the regulations require each cost estimate to be valid, it is difficult to understand how the FPC could avoid making some "spot adjustments" when a cost estimate is determined to be plainly wrong, such as in this case.

Moreover, in this case the FPC did not make a post-record spot adjustment such as that rejected in *Pennsylvania Electric Co.,* Opinion No. 739–a (Oct. 5, 1976).[18] Here the FPC held that the evidence on the record did not support PSCI's estimated purchased power expense, and therefore that expense should not be allowed. PSCI does not, nor could it, deny that there is ample support in the record for that conclusion.

Having concluded that the adjustment was not procedurally improper, the question remains what action, if any, need the FPC take after it has corrected a single error in costs. PSCI argues that the record is replete with statements suggesting that if the estimated purchased power costs were altered then other cost adjustments would have to be made. Based on that assertion, the utility concludes that the FPC's decision not to make other adjustments was unsupported by substantial evidence.

PSCI, however, cannot rely merely on general statements that adjustments would be necessary. All that this adjustment did was lend some credence to the assertion that some other estimates might be "unreasonable." It is, however, the filing utility's burden to demonstrate that such a result might occur. It certainly makes little sense to require the FPC to examine every cost estimate that might be influenced by its decision before permitting it to reject a single cost estimate that is plainly unreasonable. To impose such a burden on the Commission would guarantee that a utility's estimates would become *pro tanto* impregnable, a result contrary to the FPC's regulatory responsibility.

The question thus reduces down to whether the FPC erred in concluding that there was insufficient evidence to support readjusting PSCI's various cost estimates.[19]

---

**18.** PSCI, relying on *Delta Air Lines, Inc. v. CAB,* 182 U.S.App.D.C. 295, 308–12, 561 F.2d 293, 306–10 (1977), argues that there is general judicial disapproval of "spot adjustments." That case, however, did not involve an assessment that a single estimate was plainly incorrect. Instead, the agency shifted the forecast year for all cost estimates from 1974 to 1977 without permitting a supplementation of the record. To call that action a "spot adjustment" comparable to the FPC's action in this case is at least an exaggeration.

**19.** In arguing for more general adjustments, PSCI points to the fact that many of its costs are allocated between retail and wholesale sales. It further notes that the drop in retail demand and the oil embargo that caused its purchased power expense to be unreasonable also made its retail and wholesale allocations incorrect. The conclusion PSCI draws then is that it is unfair to change one estimate that is incorrect for reasons that also affect many other estimates.

The argument has a surface appeal, but it ignores the fact that even if the purchased power cost estimates were incorrect, in part,

Notwithstanding that PSCI's estimated purchased power costs were at issue throughout the administrative proceedings, PSCI made no offer of proof as to any specific consequences that would arise from an FPC decision to reject one cost estimate and substitute a lower one.[20] On such a record, the FPC properly determined that PSCI's purchased power expense was zero.

## VIII

PSCI's system for delivering electrical power from its generating plants to its customers—both wholesale and retail— utilizes three different types of transmission lines: the backbone grid, transmission-level radials and distribution-level radials. The backbone grid consists of large, interconnected or looped lines that move the power from the generating plants to the radial lines. They are looped to guarantee continuance of service if some fault in the system prevents the flow of power to a radial line from one direction. The transmission-level radials are power lines that are smaller than those on the grid, but are larger than the distribution-level radials. Both types of radial lines, however, move the power in only one direction and they both serve the same function, i.e., to carry power from the grid lines to the load or ultimate purchaser of power from PSCI.

Since the lines represent basically an integrated system for the total delivery of power to all of PSCI's customers, the problem becomes how to allocate the costs of the various lines between wholesale and retail customers. In this case all parties agree that the backbone grid lines' wholesale costs should be allocated on the basis of that class's demand for power measured over an agreed-upon period of time. In addition, there is no dispute as to the costs of the distribution-level radials (the smallest lines). All parties agree that the costs of those lines should be assigned to customers that specifically benefit from the receipt of power over those lines. The only issue is whether the transmission-level radials should be allocated as the backbone grid lines are or similar to the way the distribution-level radials are. PSCI sought the latter, but the FPC held that the costs should be rolled-in with the backbone grid costs and thus allocated them on a demand basis.

In reaching that conclusion, the FPC, relying on *Detroit Edison Co.*, Opinion No. 748 (Dec. 30, 1975), reasoned that a transmission system "which is designed and constructed to achieve maximum efficiency, and reliability on a system-wide basis establishes a factual predicate necessitating the adoption of a 'rolled-in' cost approach. . . ." (R. at 4826). The FPC found that PSCI's system was fully integrated and that no evidence supported the conclusion that some portion of that system was isolated for cost allocation purposes. *Compare United Gas Pipe Line Co.*, 31 F.P.C. 1180, 1197 (1964). In fact, PSCI presented evidence that shows that the costs assigned to those lines are based on total system average costs, not on their separate costs (R. at 780–83). Finally, the FPC relied on the fact that the transmission-level radial assigned to Crawfordsville, Indiana was capable of carrying power in quantities much greater than that community could ever require. The FPC drew the inference from

because of that faulty assumption, it does not mean that all other estimates based on that assumption have become unreasonable. It is important to note in this regard that PSCI netted over 7 million dollars in power sales in 1973, but estimated it would lose over 15 million dollars in 1974. That fact alone casts doubt about the reasonableness of PSCI's estimate. On the record before us, we do not know whether any of the other estimates PSCI wants readjusted were questionable even before the events of 1974 affected them.

20. PSCI also complains that it should have been given an opportunity to supplement the record in response to the FPC's decision. PSCI had a complete opportunity to demonstrate the effects of demand changes at the original hearing and for reasons it alone knows it chose not to offer any proof. Under such circumstances, the Commission was under no obligation to reopen the record to rehash three year old data. Its decision was not an abuse of discretion. *See Bowman Transp., Inc. v. Arkansa-Best Freight System, Inc.*, 419 U.S. 281, 294–95, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *ICC v. Jersey City*, 322 U.S. 503, 514–15, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944).

that fact that at least some of PSCI's transmission-level radials either have or will have a bulk power transmission function which benefits or will benefit the entire system. That inference seems to us quite reasonable. Thus, we find substantial evidence on the record as a whole to support the FPC's conclusion that these lines are designed to benefit all customers. *See* 16 U.S.C. § 825 *l*(b); *Gainesville Utilities Dept. v. Florida Power Corp.*, 402 U.S. 515, 527, 91 S.Ct. 1592, 29 L.Ed.2d 74 (1971); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

PSCI in its brief presents several arguments in response to the FPC's conclusion, but they reduce to two contentions. First, PSCI states in several ways that most of the transmission-level radials primarily benefit wholesale customers and yet if charged on a demand basis they will not pay for the full measure of that benefit. Even if it is true that in some sense much of the present benefit from these transmission-level radials accrues to wholesale customers, an issue we do not decide, there was still substantial evidence to support the FPC's conclusion that those lines are designed to benefit both now and in the future all customers in the system and that all customers should be made to pay only for that portion they demand from the system. The fact that these lines are not presently looped or the fact that the FPC considered the voltage level as opposed to merely the "function" of the transmission-level radials does not alter our conclusion.

■ Second, PSCI argued that since the Public Service Commission of Indiana, in regulating PSCI's retail sales has allocated these costs on a specific assignment basis, the FPC's refusal to do the same is confiscatory since it will deprive PSCI of its ability to recover costs for some of its lines. We recognize that it is generally a good idea for there to be consistency in wholesale and retail cost allocation methods. *See* J. Doran, F. Hoppe, R. Koger & W. Lindsy, Electric Utility Cost Allocation Manual xiii (1973). Nonetheless, the FPC must allocate costs in a fashion it believes correct. There

is no "confiscation" in such a situation so long as the FPC's action is not unreasonable and is supported by substantial evidence. We believe the FPC has so acted in regard to this issue, and we therefore find no error in its allocation of PSCI's transmission-level radial costs.

IX

The next issue also deals with the allocation of certain general costs ultimately between wholesale and retail customers. In this instance, the question is how to allocate the costs of PSCI's "general plant." These are facilities not directly tied to the production, transmission or distribution of electrical power such as office buildings and equipment associated with the accounting, legal and advertising departments of the regulated utility.

In allocating these costs, it is necessary to break down or functionalize the general costs by assigning them to the production, transmission or distribution function of the utility. After this assignment is made, then each customer group can be allocated a portion of the general plant costs on the same basis that the cost of the individual function is allocated.

PSCI proposed functionalizing the costs for general plant using the same ratios it used to functionalize the costs of its other plant costs. Wabash argues, not unpersuasively, that since most of the work conducted in the general plant is "administrative and general" that it is most reasonable to functionalize costs on the basis of labor costs paid for each function occupying the general plant facilities. *See Sierra Pacific Power Co.*, Opinion No. 730 (May 15, 1975).

■ Our review of an issue such as this is very limited and we cannot substitute our judgment for that of the FPC so long as substantial evidence supports its decision. *Permian Basin Area Rate Cases, supra,* 390 U.S. at 767, 88 S.Ct. 1344; *Gainesville Utilities Dept. v. Florida Power Corp., supra,* 402 U.S. at 527, 91 S.Ct. 1592, PSCI did present an expert witness to testify that its approach to functionalization

was reasonable in this case (R. at 865). Thus, record evidence does support PSCI's allocation method. In addition, the FPC's staff witness conceded that there is no perfect method of functionalizing the costs of general plant (R. at 1463). Thus, on this record, the evidence could have supported the FPC's adoption of either approach.

In addition, the FPC noted that to adopt PSCI's proposed approach would guarantee consistency between state and federal regulatory practices on this issue (R. at 4829). As we suggested in part VIII of this opinion, such consistency is not required, but if supported by the record it is an eminently reasonable basis for deciding between difficult alternatives.

In response to Wabash's argument that the FPC's decision in *Sierra Pacific, supra,* should control, we note that the FPC has permitted general plant to be allocated on the basis of plant ratios in other cases. *See, e. g., Municipal Light Boards of Reading,* Opinion No. 729 at 22 (May 13, 1975) (cited in the FPC's opinion in this case). Thus, the Commission has not relied on the policy considerations expressed in that opinion as a basis for adopting the view that only one allocation approach is permissible.

Given our narrow scope of review, we must accept the FPC's decision that PSCI's use of plant ratios is a reasonable method of allocating general plant.

### X

In determining a utility's rate base, the costs of constructing new facilities are not included during the period of construction. The utility's funds used for construction—the current work in progress (CWIP) account—are not considered part of the utility's operation until the end product is "used and useful." The FPC, however, does permit the utility to acquire a return on the value of the money that it has to use in construction. For that purpose the FPC permits a utility to submit an allowance for funds used during construction (AFUDC) account. That account "includes the net cost for the period of construction of borrowed funds used for construction purposes

and a reasonable rate of return on other funds when so used." 18 C.F.R. part 101, Electric Plant Instructions 3(17) (1977).

In determining the appropriate amount to be included in the AFUDC account, there must be an assessment of (1) the source of the invested funds and (2) the rate of return for each source of funds. (R. at 4818). As to the source of the funds, the FPC concluded that it would be "virtually impossible to 'dollar trace' the monies actually invested in plant under construction." (R. at 4818). The FPC therefore took all of PSCI's outstanding short term debt and gave it a return equal to the prevailing market cost of debt. This amounted to less than ten percent of the construction costs. It then took the rest of the funds and allocated them into long term debt, preferred stock and common stock in about the same ratio as in the utility's overall capitalization ratio. It then set the cost for each class of AFUDC funds equal to that approved for PSCI's overall rate of return, i. e., 6.20% for long term debt, 5.20% for preferred stock and 13.00% for common stock.

Wabash and the Cities as intervenors argued first that the allocation of the funds into categories of debt and equity was incorrect because it failed to trace the actual dollars used as proposed by their witness. The FPC found the intervenors' tracing efforts to be "arbitrary." Intervenors' witness claimed that he had put together an exhibit of construction debts based on PSCI's Monthly Operating and Statistical Reports, prospectuses, annual reports and some other unspecified documents. It is unclear from the record what specific allocations he made. Thus, we cannot independently assess the appropriateness of the witness's approach. In such a situation, we must defer to the expertise of the Commission. Since the specific dollars used for construction cannot be traced, and no other allocation method was suggested, we accept the FPC's allocation of funds as reasonable.

Intervenors argue secondly that it was improper to use rate-making costs as the costs for AFUDC funds. Their witness

took the view that all funds should be costed as debt.[21] The FPC's view was that while debt costing was appropriate in the past, *see*, e. g., *Northern Natural Gas Co.*, 11 F.P.C. 123, *aff'd*, 206 F.2d 690 (8th Cir. 1953) when construction was a minimal part of a utility's operation, today when construction is a critical part of a utility's activities, the risks of financing must be compensated more like the rate of return on equity. Intervenors do not, nor could they, contest the fact that utility construction financing has changed dramatically in recent years. The FPC's approach represents a sensitive effort to provide some relief to the utilities faced with the burden of increased construction costs.[22] We believe the approach is quite reasonable, and therefore accept the FPC's conclusion as to the appropriate amount of AFUDC.

### XI

The next issue is related to the previous one in that it ultimately calls into question another aspect of PSCI's and the FPC's treatment of AFUDC. Since the ultimate legal issue is embedded in accounting manipulations, a brief description of PSCI's relevant accounting procedures should provide a useful background for our review. In the past, utilities allocated all of the interest payments they made on funds used during construction to "utility" operations. These interest payments were and are tax deductible. Since the deductions from these expenses were all included in utility operations, they reduced the expenses to the utility's cost of service, thus reducing the rates to customers.

As suggested in the previous section of this opinion, PSCI, and all other electric utilities, has faced substantial increases in construction costs in recent years which have caused a significant cash flow problem. In response to that problem utilities have begun allocating some portion of their interest payments, in this case $6,658,000, to "non-utility" operations. Since the tax deductions associated with these payments are concomitantly excluded from the utility's cost of service, these costs are somewhat deceptively inflated and thus the rates charged to customers are somewhat higher than they would be without these manipulations.[23]

This result was justified in the FPC's opinion "by virtue of the fact that PSCI has developed a net-of-tax rate for determining the cost of borrowed funds used during construction in computing AFUDC." (R. at 4303). In other words, PSCI receives its rate of return on a lower AFUDC sum than it would if it used an after-tax basis. The ultimate effect then of all these accounting manipulations is to permit PSCI to retain the present cash flow from an inflated rate base, and require it to deduct that benefit from the cost of plant after it becomes used and useful. Stated simply, PSCI is normalizing the tax effects of its interest deductions.

In accepting PSCI's approach, the FPC relied heavily on its new regulations, passed after the locked-in date of PSCI's proposed rate, in which the FPC approved normalization treatment of interest deductions. Orders No. 530 and 530–B (June 18,

---

**21.** The witness argued that "it is illogical and uneconomical to use, unnecessarily, funds which carry a commitment more expensive than the interest standard" (R. at 1407). Such has been the FPC's position in the past. *See, e. g., South Carolina Generating Co.*, 19 F.P.C. 855, *aff'd*, 261 F.2d 915 (4th Cir. 1958).

**22.** Intervenors complain that the FPC employed the approach adopted in its new regulations issued February 2, 1977, see 18 C.F.R., part 101, Electric Plant Instructions 3(17)(b), but that those regulations had not been adopted for the locked-in period of this rate increase. The only significance that attached to the fact

the regulations were not adopted is that the Commission was not bound to follow them. First, all parties were aware of the Notice of Proposed Rulemaking and second the FPC carefully explained why it was departing from the precedent cited by intervenors. There is no error in the FPC's approach in this case.

**23.** This result can be justified conceptually at least if we consider that these interest payments are being incurred for the benefit of future customers and thus it is somewhat unfair to let the tax benefits accrue to the present customers.

1975 and July 6, 1976).[24] In adopting these regulations, the FPC concluded that the normalization of interest deductions does not lead to a tax savings by the utility, but rather merely permits tax deferral. *See Alabama-Tennessee Natural Gas Co. v. FPC*, 359 F.2d 318, 327, 328 (5th Cir.), *cert. denied*, 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966); *Memphis Light, Gas & Water Div. v. FPC*, 163 U.S.App.D.C. 130, 134, 500 F.2d 798, 802 (1974). It determined that that conclusion is valid in all cases, notwithstanding the lengthy construction projects that many electric utilities have planned.

Wabash contests the tax deferral finding as applied in this case and argues that the general rule in the regulation cannot be relied on to avoid a particularized inquiry since the regulations were not passed until after the last effective date of PSCI's proposed rate increase. We believe that the FPC correctly relied on its regulation. As the Supreme Court has made clear "[t]he general rule . . . is that an appellate court must apply the law in effect at the time it renders its decision." *Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 281, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969). In *Thorpe* the law that had changed was an administrative ruling as in this case. It makes no difference that the decision maker in this case is a federal regulatory agency rather than a court as in *Thorpe*. In fact, it would be more anomalous for an agency to ignore its own regulations than for a court to disregard a subsequently passed statute. We therefore find no error in the Commission's decision not to ignore its regulations.[25]

The only issue that remains then is whether the regulation should apply to PSCI. Both the ALJ and the Commission were satisfied that it should and we believe that judgment is reasonable. We therefore conclude that the FPC's action in approving PSCI's normalization of the tax effect of interest was a proper exercise of its ratemaking authority.

## XII

The Cities contest the amount of PSCI's period II or estimated working capital allowance account of $13,455,000 in its rate base.[26] These are the funds used to cover the lags between disbursements and receipts in the day-to-day business of the utility. The general FPC practice is "that a utility may include in its rate base an amount of working capital equal to estimated expenditures for 45 days for operation and maintenance." *Louisiana Power & Light Co.*, Opinion No. 813 at 5 (July 21, 1977) (per curiam). *See also Union Electric Power Co.*, 47 F.P.C. 144, 175 (1972).

The Cities do not contest this 45-day rule. Instead, they argue on two grounds that the estimated operation and maintenance costs on which the working capital allowance is based are excessive. First, the Cities contest the inclusion of fuel costs in 1974 for a power station that was not to be put into operation until January 1, 1975. PSCI's witness, however, stated that there would be "pre-operational testing starting in the latter half of 1974." (R. at 277). Also, there would have to be some stockpiling in 1974 so that the power station could go into operation at the beginning of 1975 (R. at 278). Thus, there was ample record evidence supporting those fuel costs. Second, the Cities complain somewhat ironi-

**24.** Judicial review of these regulations is presently pending before the District of Columbia Circuit.

**25.** We should note that even if the regulations could not be applied directly that the FPC concluded that its previous decisions did not preclude it from normalizing tax effects. The FPC reasoned that the rule derived from *Detroit Edison Co.*, Opinion No. 748 (Dec. 30, 1975) and *El Paso Natural Gas Co.*, 46 F.P.C. 454 (1971) was intended to preclude "double return on tax effect," but that here the ALJ found as a

fact that no such recovery would arise in light of the net-of-tax rate used in computing AFUDC. Since we believe there is no basis for contesting that finding, we conclude that even absent the regulations the FPC's decision would have to be affirmed.

**26.** PSCI's period I or actual working capital allowance for 1973 was $12,329,000. Thus, the estimated cost for 1974 called for a quite modest increase.

cally in light of recent events, about the inclusion of stockpiles of coal in anticipation of a coal miners' strike in 1974 which they characterize as an extraordinary item. It seems to us quite reasonable for the FPC to conclude that stockpiling by a utility for that purpose is not extraordinary and thus is an allowable expense. We find no basis for criticizing the FPC's judgment on this issue.

■ The Cities also contend that the FPC erred in not offsetting PSCI's working cash allowance by a larger sum to account for the extra dollars its customers pay to cover taxes that have not come due. PSCI deducted over one million dollars based on 5.5 percent of its estimated 1974 taxes. The Cities argue and cite evidence [27] to the effect that 10.42 percent was a more appropriate figure.

PSCI's witness, however, testified that the 5.5 percent figure was derived from its 1972 records, and although the specific study that supported that conclusion was not put into evidence, there was no reason to doubt the veracity of the witness. Thus, substantial evidence supported the FPC's conclusion. We therefore find no basis for rejecting the FPC's decision as to the appropriateness of PSCI's estimated working capital allowance.

### XIII

■ The final issue raised in this appeal, and the only issue brought by IMEA, is whether the FPC erred in permitting PSCI to change its billing determinants from kilowatts to kilovolt-amperes. Notwithstanding the unusual nature of the issue, we are compelled to review the FPC's conclusion.

Nevertheless, we do believe that it would be difficult to find an issue that is more appropriate for the court to pay substantial deference to the FPC's presumed expertise. *See City of Cleveland v. FPC*, 174 U.S.App. D.C. 1, 6, 525 F.2d 845, 849 n. 36 (1976).

The FPC found that this was a rate design change [28] and that as such the only question was whether this billing method was reasonable. It concluded that it was in the absence of any proven "untoward effects" (R. at 4797). We find no basis for reversing that conclusion. In addition, although we recognize that the evidence is scant on either side of the issue, we agree with the FPC that since this is not a rate increase question "there is no reason to require additional evidence" (R. at 4797). We therefore decline to alter PSCI's billing determinants.

For the reasons stated above, we affirm all aspects of the FPC's Opinions No. 783 and 783–A with the exception of its ruling under section 205(b) of the Act that there has been no undue discrimination in the rates charged among the Cities. As to that issue, we reverse and remand for further proceedings not inconsistent with this opinion.

AFFIRMED in part;

REVERSED and REMANDED in part.

**27.** The evidence was no more than a statement by the witness that the FPC usually uses 10.42% as the appropriate figure rather than the 5.5% that PSCI used (R. at 1283). The evidence therefore presents no facts unique to PSCI that justifies the percentage chosen.

In addition, no cases are cited by the Cities in which the FPC has adopted a 10.42% tax rate. On the other hand, the Commission has expressly rejected a 10% offset suggesting that the accrued taxes pending quarterly payment "are no longer of such substance, proportion and continuity that they can be relied upon as a source of working capital." *Sierra Pacific Power Co.*, Opinion No. 730 at 8 (May 15, 1975).

**28.** It seems to us that the proposed billing method does no more than give IMEA greater control over the number of billing units it will consume. Thus, if IMEA improves its "power factor"—a term none of the parties defines for the court—then it will certainly pay no more for power and may even pay less. Therefore, it seems clear that this is not a "rate increase" as we generally think of that term.